Jeffrey Jonathan DeMARS, Appellant,

v.

STATE of Minnesota, Respondent.

No. C8–83–536.

Supreme Court of Minnesota.

July 13, 1984.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, John E. MacGibbon, Sherburne County Atty., Richard D. Clough, Asst. County Atty., Elk River, for respondent.

WAHL, Justice.

Jeffrey DeMars appeals from an order of the Sherburne County District Court deny-

ing his post-conviction petition for reversal of his conviction or a new trial. He was convicted of first-degree murder on June 26, 1981, after a trial to the court in which the only issue was whether he was suffering under such a defect of reason as not to know the nature of his act or that it was wrong at the time he stabbed his mother 56 times, causing her death. The trial court found that he knew the nature of his act so that he was not relieved of criminal liability for his act by his mental illness. DeMars was given the mandatory life sentence but has been at the Minnesota Security Hospital in St. Peter since a few days after the stabbing, pursuant to civil commitment as mentally ill and dangerous. We affirm the conviction.

DeMars was 20 years old the summer of 1980. He was discharged from the Marine Corps for psychological problems early that summer. He returned to St. Cloud to live with his mother, Priscilla DeMars, and his sister, Marcia DeMars. He and his mother did not get along well, so he started living at the apartment of his brother Steven's girlfriend, Debra Lauer, early in July. Most of his personal belongings remained at his mother's house.

Prior to the stabbing, which occurred on July 27, 1980, DeMars began to give away his personal belongings, including some cash he had been saving for a car. He told his brother Mark that he was going to have to kill someone. In his statement to the police, he said that he had been hearing a voice during this time telling him that if he did not kill his mother, they would both be killed.

During the evening of July 27, DeMars watched television with his brother Steve and Lauer. He was even more withdrawn than usual during that time. Steve left to go home, and DeMars asked Lauer if he could borrow her car to go to his mother's house for a change of clothing. She gave her permission, and he left at approximately 10 p.m.

While DeMars was at his mother's house, he got a knife from the kitchen and stabbed her while she was asleep, then cleaned the knife and returned it to the kitchen. He also called a former friend, Jeffrey Ostendorf, who had accused him of stealing a ring belonging to Ostendorf. DeMars' mother had settled the dispute by paying Ostendorf $50. DeMars insisted that Ostendorf come over immediately to discuss the dispute over the ring. Ostendorf testified that DeMars sounded upset and was half crying. Ostendorf finally hung up on him. DeMars changed pants and threw his blood-soaked jeans in a nearby granite quarry. At approximately 11 p.m., he returned to Lauer's apartment, where Lauer asked him why he had not changed his shirt also. DeMars left again and returned to his mother's house, where he tried to drag his mother's body out of the house but could not because it was too heavy.

At approximately 11:45 p.m., DeMars' sister Marcia returned home and was met by DeMars, who told her that their mother was dead. Marcia ran to a neighbor's house and called Lauer to ask her to call Steve. The neighbors called the police. DeMars returned to Lauer's apartment and walked in while Lauer was telephoning Steve. He told her he had killed his mother and apologized for getting blood on her car and getting her involved. Lauer helped him wash his cuts, and DeMars then went out to wash the blood off Lauer's car. Lauer testified that DeMars was calm throughout this time.

Steve arrived and called the police, who arrived and found DeMars in Lauer's kitchen still cleaning up. They entered with guns drawn. When he saw them, DeMars slumped to the floor, covered his face, and said he had killed his mother and was glad he was no longer a "mamma's boy." He was given a *Miranda* warning but continued to make inculpatory statements. The St. Cloud police chief arrived and gave the *Miranda* warning again, which DeMars again said he understood. DeMars continued to make inculpatory statements. At one point that night, he said, "My soul hurts."

The police noticed that DeMars had knife wounds on his hands and legs and took him to a hospital. He had been calm up to that point, but he became agitated and resisted having sutures put in his hand. He had to be strapped to an operating table so that hospital staff could care for his wounds. The police then took him to the St. Cloud Police Station, where the police chief attempted to interview him. DeMars' only response to questions relating to his mother was to grit his teeth, growl, roll his eyes, clench his fists and become irrational. Finally, the original arresting officer, with whom DeMars was acquainted, was able to take a statement from him. DeMars described his actions that night and kept referring to voices making him do it. The next morning he identified the knife he used for the stabbing. His behavior subsequent to this time became irrational and uncontrollable. On August 1, DeMars was committed as mentally ill and dangerous. When he arrived at the hospital in St. Peter, he was diagnosed as being in an active psychotic state. The psychosis was eventually controlled by large doses of a psychotropic medicine.

At trial, Dr. Steven Doheney, a clinical psychiatrist at the security hospital, testified that DeMars is a paranoid schizophrenic and, in Doheney's opinion, was in an active psychotic state at the time of the stabbing. He said that DeMars probably knew he was killing his mother and that it was legally wrong but that he had no control over his actions and did not know it was morally wrong. At the point of the killing, the voices had complete control over DeMars. He could not make a conscious choice. Dr. Carl Schwartz, a forensic psychiatrist, also testified that DeMars is a paranoid schizophrenic and, in Schwartz's opinion, was in an active psychotic state when he killed his mother. He said that, although DeMars knew his actions were legally wrong, he thought them to be morally right because he was obeying the commands of the auditory hallucina-tions. There was no other psychiatric testimony at trial.

Minn.Stat. § 611.026 (1982) provides:

No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong.

The rationale underlying this principle of law, which was first recognized in English law during the 13th century[1] and which has been a part of Minnesota law since its inception, has been succinctly stated in Note, "Criminal Responsibility: Changes in the Insanity Defense and the 'Guilty But Mentally Ill' Response," 21 Washburn L.J. 515, 516 (1982):

The principle that one who commits a criminal act while insane should not be held criminally responsible for the act stems from the view that such a person has neither criminal intent nor free will at the time he commits the act. Punishing such a person would therefore be "morally impermissible," and would serve no societal purpose.

Our cases have held, however, that even though a defendant may be suffering from mental illness, he may not be excused from criminal liability under section 611.026 unless that mental illness caused such a defect of reason that at the time of the incident, the defendant did not know the nature of his act or that it was wrong. *State v. Bott*, 310 Minn. 331, 334, 246 N.W.2d 48, 51 (1976).

The issue before the trial court and the post-conviction court and before this court now is whether DeMars knew his actions were wrong at the time he killed his moth-

---

1. In England, by 1326, absolute "madness" was a complete defense to a criminal charge. J. Biggs, *The Guilty Mind* 83 (1955); S. Glueck, *Mental Disorder and the Criminal Law* 125 (1925).

er. Both psychiatrists testified that they thought DeMars knew that he was stabbing his mother and that the police could punish him for his actions. They thought, however, that DeMars was in an active psychotic state during the stabbing and therefore had lost any capacity for moral judgment. Morally, according to the expert witnesses, DeMars thought he was doing the right thing.

The trial court rejected the testimony of the psychiatrists that DeMars was in an active psychotic state during the stabbing. It looked instead to other evidence. All of the persons who had contact with DeMars just before and after the stabbing, Debra Lauer, Steven DeMars, Marcia DeMars, and the police officers, testified that DeMars' behavior was calm until several hours after he killed his mother. Steven DeMars and Debra Lauer said that the only change from his normal behavior was that he was more quiet than usual that evening. They both said, however, that there was nothing unusual about his behavior because he was usually very quiet. DeMars tried to dispose of his mother's body. He threw his blood-soaked jeans into a granite quarry and tried to wash the blood off Lauer's car. After the police arrived he continued to be calm and able to communicate rationally. Before he became completely irrational and uncontrollable, he responded to a question from a police officer by saying, "My soul hurts." The trial court concluded that, given all the testimony, DeMars knew at the time of the stabbing that killing his mother was legally and morally wrong and that his psychotic episode did not begin until sometime after the stabbing.

▆▆▆ In Minnesota, a defendant must prove mental illness at the time of the crime by a preponderance of the evidence. *State v. Malley*, 285 N.W.2d 469, 472 n. 3 (Minn.1979). This court conducts "a rigorous review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the trial court to reach its conclusion."

*State v. Mytych*, 292 Minn. 248, 252, 194 N.W.2d 276, 279 (1972). In this case, the factfinder weighed the evidence and determined that DeMars did not prove by a preponderance of the evidence that he was mentally ill at the time he stabbed his mother. Our review of the record convinces us that there was sufficient evidence to support the trial court's determination. Given DeMars' behavior before and after the stabbing, he may or may not have been in an active psychotic state. There is no compelling evidence in this case, however, for us to reverse the factfinder's conclusions.

▆▆▆ In reaching its determination, the trial court rejected the testimony of the two psychiatrists and relied on DeMars' statement, "My soul hurts," and the testimony of DeMars' calmness and attempts to cover up his actions. In a criminal case, the factfinder is not bound by expert testimony, even where the only experts to testify support the defendant's assertion of mental illness. *State v. Hoskins*, 292 Minn. 111, 137–38, 193 N.W.2d 802, 819 (1972). The credibility of the witnesses and the weight to be given their testimony are determinations to be made by the factfinder. Given the facts and circumstances in this case, we cannot say that the trial court was wrong in the weight it assigned to the psychiatrists' testimony.

▆▆▆ This is a particularly difficult and troubling case. After reviewing the record and viewing the evidence most favorably to support the verdict, however, we hold that there was sufficient evidence to support the trial court's determination that DeMars knew the nature of his act and that it was wrong so that he was not relieved of criminal liability for his act by his mental illness.

Affirmed.

TODD, Justice (concurring specially).

I concur in the results of this decision. However, I would point out that the use of psychiatric testimony relative to the defense of insanity is now governed by our decisions and the change in our rules of

criminal procedure which mandate a bifurcated trial. *See State v. Bouwman*, 328 N.W.2d 703 (Minn.1982); *State v. Hoffman*, 328 N.W.2d 709 (Minn.1982); Minn.R. Crim.P. 20.02, subd. 6(2) (1983).