**STATE of Minnesota, Respondent,**

v.

**Charles Ray WILSON, Appellant.**

No. C8-94-1679.

Supreme Court of Minnesota.

Oct. 27, 1995.

Susan J. Andrews, St. Paul, for appellant.

Hubert H. Humphrey, III, State Attorney General, St. Paul, Susan Gaertner, Ramsey County Attorney, St. Paul, for respondent.

## OPINION

KEITH, Chief Justice.

Defendant appeals from his conviction for two counts of first-degree murder and two counts of felony murder in the killings of Elaine Furey and Alfred Stafki. Three issues are presented on this direct appeal: (1) Whether defendant was so mentally ill or deficient at the time of committing the murders that he did not know the nature of his act or that it was wrong; (2) whether the trial court erred in sentencing defendant to two consecutive life terms; and (3) whether the trial court erred when it formally adjudicated defendant guilty of all four counts of first-degree murder when there were only two victims.

We vacate the two felony murder convictions and otherwise affirm the trial court.

Defendant is an 11-year Navy veteran who was discharged from the service due to obesity on October 2, 1991. He came directly to St. Paul to look for work as a blood lab technician, the position he held while in the Navy. Unable to find work, he lived on his Navy termination pay and unemployment compensation, supplemented by occasional loans from family members.

On December 14, 1992, defendant left his apartment and drove to the vicinity of the Flower Hut, a florist shop located on Rice Street in St. Paul. At approximately 1:00 p.m., he parked his car on Winnipeg Street and, after selling some used books and visiting a pet store, entered the Flower Hut. He browsed in the Flower Hut for approximately five minutes, noting that the sole employee, Elaine Furey, was an "elderly female," and then went to a nearby furniture store.

After visiting the furniture store, defendant returned to his car, drove it around the block, and parked it in the alley behind the Flower Hut. Before reentering the Flower Hut, he took a 12″ Buck hunting knife from his gym bag and hid the knife on his person. He entered the store through the rear entrance and Furey, surprised, asked him what he was doing. He took out his knife, forced her face down on the floor, and stabbed her repeatedly in the back, neck, and head. Defendant later claimed that before he stabbed her he heard thoughts, voices, and feelings that she did not deserve to live. According to the medical examiner's report, defendant stabbed Furey nineteen times, severing her cervical spinal cord. Defendant claimed that Furey's last words were "I forgive you." After stabbing Furey to death, defendant removed a cigarette case from her hand and went to the front counter, where he tried unsuccessfully to open the cash register.

At that point, Alfred Stafki, a 74-year-old delivery man, entered that store and asked, "Where is the gal [Furey]?" Defendant said he did not know. Stafki, apparently thinking she was out back, went to the cooler and began picking up boxes of flowers. Defendant walked towards the front door and, seeing only Stafki's van outside, came up behind Stafki and stabbed him. Defendant then forced him face down on the floor and, according to the medical examiner's report, stabbed him repeatedly in the back, neck, and head. Defendant claims that Stafki's last words were "Bless you."

Defendant then took the keys lying next to the cash register, locked the front door, and turned off the lights. However, before leaving the store, he took Stafki's wallet from the victim's left pocket and unplugged the cash register, carrying it to the rear of the store. He covered the cash register with a coat and a pair of pants he found in the store, and left through the back door, locking it on his way out. He put the cash register in the back of his car and promptly returned to his apartment.

He then took the cash register, wallet, and cigarette case into his apartment and counted the money taken: $10 to $15 from the cash register, $30 to $40 from Stafki's wallet, and $4 to $5 from Furey's cigarette case. He took apart the cash register, carefully

cleaning it and other items taken from the crime scene in bleach. He then hid the items in a box in the common area of the laundry room in his apartment building. He also washed the clothes he wore during the crime twice in bleach. He described himself in his police statement as being "totally distraught" and wanting to "wash away the guilt." He threw the clothes away in the trash dumpster located behind his apartment building.

Defendant read about the killings in the St. Paul Pioneer Press the following day. He claims to have spent the three days after the killing in terrible mental anguish, and contacted a minister to act as a mediator between him and the victims' families. On or about December 28, 1992, he sold his car, claiming that he no longer needed it because he planned to turn himself in in a few days.

On December 31, 1992, defendant went to the Veterans Administration Hospital in Minneapolis and confessed to the murders to a social worker, a psychiatrist, and two St. Paul police officers. He gave detailed statements concerning the murders and robbery to the police on that day and on the following day, January 1, 1993. On January 20, 1993, defendant was indicted on two counts of first-degree murder and two counts of felony murder. On March 29, 1993, after withdrawing his motion for a contested hearing on the issue of his competency to stand trial, he notified the state that he intended to rely on the defense of not guilty by reason of mental illness.

The facts of the guilt phase of the bifurcated trial were stipulated to and submitted to the trial court, which found defendant guilty of two counts of first-degree murder and two counts of felony murder for the deaths of Alfred Stafki and Elaine Furey. Defendant waived his right to a jury trial during the insanity phase. The defense presented expert testimony from one psychiatrist who concluded that defendant did not understand that killing Elaine Furey and Alfred Stafki was wrong when he did so and that, therefore, he was legally insane. The state offered expert testimony from two forensic psychiatrists and a neuropsychologist, all of whom concluded that defendant was not legally insane at the time he committed the murders. The court found that defendant should not be excused from criminal responsibility by reason of mental illness. We affirm.

## I.

 In order to be excused from criminal responsibility, a defendant must demonstrate that "at the time of committing the alleged criminal act [she or he] was laboring under such a defect of reason, from [mental illness or deficiency] as not to know the nature of the act, or that it was wrong." Minn.Stat. § 611.026 (1994) (the M'Naghten rule). The defendant bears the burden of showing by a preponderance of the evidence that he was mentally ill at the time of the crime. *DeMars v. State*, 352 N.W.2d 13, 16 (Minn.1984). Both expert and lay testimony is admissible on this issue. *State v. Schneider*, 402 N.W.2d 779, 784 (Minn.1987). In determining whether a defendant has met his burden, the fact-finder may consider evidence that relates to cognition, volition, and capacity to control behavior. *State v. Rawland*, 294 Minn. 17, 46, 199 N.W.2d 774, 790 (1972).

This court has consistently held that the issue of legal mental illness is a question for the fact-finder to resolve. *See State v. Brom*, 463 N.W.2d 758, 764 (Minn.1990), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991); *Rawland*, 294 Minn. at 45, 199 N.W.2d at 789. This court has also granted broad deference to the fact-finder in determining the appropriate weight to assign expert psychiatric testimony. *See DeMars*, 352 N.W.2d at 16.

Defendant claimed at trial that he demonstrated his legal mental illness by a preponderance of the evidence and that his convictions should therefore be reversed. The experts were divided on the question of the type and severity of mental illness. One of defendant's two expert witnesses testified that defendant was suffering from the major mental illness of paranoid schizophrenia, based on defendant's reported voices (auditory hallucinations) which compelled him to kill. By contrast, defendant's other expert witness, as well as the state's three expert witnesses, concluded that defendant suffered

some sort of personality disorder, but not paranoid schizophrenia, and that he showed no signs of delusions or hallucinations.

▮ Even if all the other expert witnesses agreed that defendant was a paranoid schizophrenic, this alone would not have required a finding by the trial court that he was mentally ill. *See DeMars,* 352 N.W.2d at 13 (holding evidence sufficient to support finding of sanity where sole expert witness testified that defendant was paranoid schizophrenic and in an "active psychotic state" at the time of killing). Moreover, this court has only reversed one murder conviction where a defendant suffered from both paranoid schizophrenia and delusions. *See Rawland,* 294 Minn. at 46–47, 199 N.W.2d at 790. However, in *Rawland* the long history of mental illness was extreme, and all four expert witnesses diagnosed the defendant with paranoid schizophrenia. *Id.* at 41–42, 199 N.W.2d at 788. In this case, defendant has never been committed to a mental hospital, had never reported hearing voices until he turned himself in to the police, and only one expert witness of the five who testified at trial concluded that he was suffering from paranoid schizophrenia at the time of the murders.

In any event, the ultimate issue is whether defendant has proved by the preponderance of the evidence that because of mental illness or mental deficiency, he did not know the nature of his act or that it was wrong.

▮ Only one of defendant's two expert witnesses concluded that he was unable to make moral judgments of right or wrong at the time of the murders. By contrast, the state's three expert witnesses all testified that defendant knew what he was doing and that it was wrong. Defendant argues that lay testimony concerning his post-arrest statements establishes that voices told him to "kill them," and these statements shed further light on his mental illness. For example, defendant's sister testified that he told her on the day after his arrest that a voice told him to commit the murders and that he still heard voices telling him to kill people. Defendant also told the police on the day he turned himself in that he heard thoughts or voices telling him to "kill them." Defendant views these statements as the truest expressions of his mental state at the time the crimes were committed, because they were made before he had consulted with his attorneys or various psychiatrists.

The state presented evidence that defendant had never reported hearing voices prior to the Flower Hut murders. Indeed, when examined by one of the state's expert witnesses, defendant vehemently *denied* hearing voices, and was angry that the press had reported that he had heard voices at the time of the murders. Also, two witnesses saw him in their retail shops just prior to the murders and testified that he appeared completely normal.

Finally, circumstances surrounding the crime may shed light on defendant's mental state at the time of the murders. *See State v. Jackman,* 396 N.W.2d 24, 31 (Minn.1986) (holding that circumstances surrounding a shooting supported jury's determination that defendant was not legally insane); *DeMars,* 352 N.W.2d at 16 (holding that defendant's calmness several hours after he killed his mother and attempts to cover up his actions were sufficient to support determination that defendant was not legally insane); *State v. Hoskins,* 292 Minn. 111, 137, 193 N.W.2d 802, 819 (1972) (holding that circumstances surrounding shooting and arson were factors for jury to consider in determining whether defendant was legally insane).

Defendant contends that his conduct at the scene of the crime and shortly thereafter was bizarre and demonstrated his mental illness. Defendant's trial counsel highlighted several of these factors at trial: that he robbed a busy flower shop during the height of the Christmas season; that he robbed a store with little cash on hand; that he killed Elaine Furey rather than tying her up or locking her in the cooler; and that he took the cash register back to the apartment rather than opening it in the store and taking the money right away.

In response, the state argues that the details surrounding the crime demonstrate that defendant knew the nature of his act and that it was wrong. He visited several businesses that day, choosing one that had a secluded rear entrance and a lone female

employee. Prior to his return to the Flower Hut, he moved his car to a secluded back alley behind the store and parked it there. After parking, he removed a large Buck knife from his bag, concealed it on his person, entered the store, saw Furey, and killed her by stabbing her 19 times. He then went to the cash register and tried to open it to take the money inside. He stabbed Stafki to death because he was the only remaining witness, and removed the wallet from his dead body.

Defendant then locked the doors to the Flower Hut and turned out the lights before leaving. He took the cash register and covered it with old clothes so it could not be seen. Once at his apartment, relying on his Navy medical training as a blood lab technician, he washed several items, including the knife, cash register, and Stafki's wallet, in bleach to remove the blood. Also, he later sold the car used during the murders because he knew from the papers that witnesses had seen a car like his leaving the back of the Flower Hut on the day of the murders.

> The trial court concluded that defendant's stealth, concealment of the weapon, return to the store when victim Furey was alone, cold-blooded conversation with Mr. Stafki, theft of the cash-register, wallet and case, cleaning of the knife, and sale of the car, speak louder than the testimony of either the defense or prosecution experts. They are the actions of a criminal, not an insane person.

In this case, there was ample testimony to justify the trial court's rejection of the evidence that defendant's mental illness prevented him from understanding the nature of his act and that it was wrong.

## II.

Defendant next contends that the trial court abused its discretion in imposing two of his four life sentences consecutively. He argues that even if this court concludes that he does not meet the M'Naghten test, his disturbed mental state at the time of the murders made him "less morally culpable than defendants who have no such excuse." *Penry v. Lynaugh,* 492 U.S. 302, 322, 109 S.Ct.

2934, 2949, 106 L.Ed.2d 256 (1989) (holding that mental retardation was a mitigating factor to be considered by jurors in capital murder case). He urges this court to consider his mental illness as a mitigating factor under Minnesota Sentencing Guidelines II. D.2.a.(3). That sentencing guideline provides as a mitigating factor that "(t)he offender, because of physical or mental impairment, lacked substantial capacity for judgment when the offense was committed." *Id.*

■ The decision to impose concurrent or consecutive multiple life sentences for first-degree murder falls within the discretion of the trial court. Minn.Stat. § 609.15 (1994). When reviewing the imposition of consecutive life sentences, this court considers whether consecutive sentences "are commensurate with culpability and not an exaggeration of defendant's criminality." *Bangert v. State,* 282 N.W.2d 540, 547 (Minn.1979). In making this determination, this court is guided by past sentences received by other offenders. *See State v. Ouk,* 516 N.W.2d 180, 186 (Minn. 1994) (affirming imposition of consecutive life sentences where defendant methodically shot each of four victims at close range where death was foreseeable result).

This court has consistently affirmed the imposition of consecutive life sentences where a defendant was convicted of multiple victim homicides. *See State v. Jobe,* 486 N.W.2d 407, 421 (Minn.1992) (stabbing two people to death, one being a two-and-one-half year old child); *Brom,* 463 N.W.2d at 765 (axing four people to death); *State v. Olson,* 291 N.W.2d 203, 208 (Minn.1980) (methodically burning three people to death); *Bangert,* 282 N.W.2d at 546–47 (shooting and killing two victims in their sleep).

Defendant cites two cases of this court in support of his argument that his mental illness is a mitigating factor which the trial court should have considered at sentencing. *See State v. Hennum,* 441 N.W.2d 793 (Minn. 1989); *State v. Wall,* 343 N.W.2d 22 (Minn. 1984).

In *Hennum,* the defendant had suffered years of physical and mental marital abuse at the hands of her husband. We held that these mitigating factors justified a downward

departure from the sentencing guidelines. 441 N.W.2d at 801. But this court cautioned that *Hennum* was "one of those rare cases in which we are justified in interfering with the trial court's decision not to downwardly depart." *Id.* *Hennum* is inapposite here because defendant can hardly argue that he suffered years of physical and mental marital abuse at the hands of his victims.

Defendant's reliance on *Wall* is similarly misplaced. In *Wall*, this court justified a downward departure in sentencing because the defendant had suffered for over 21 years from paranoia and schizophrenia, and had been institutionalized several times during this period for mental illness. *Id.* at 23–24. By contrast, defendant has never been hospitalized for mental illness, and the exact nature of his mental impairment, if any, remains medically unclear.

This court has emphasized that only *extreme* mental impairment justifies a mitigation of sentence. *State v. Lee*, 491 N.W.2d 895, 902 (Minn.1992). In *Lee*, mitigation was held improper because the experts overwhelmingly concluded that the defendant's mental condition did not deprive him of control over his actions. *Id.* Although the defendant was depressed, angry, and impulsive, this court held that he "did not suffer from an *extreme* mental impairment that would warrant different treatment at sentencing." *Id.* (emphasis in original).

In this case, the experts with one exception overwhelmingly concluded that defendant's mental condition did not deprive him of control over his actions. While defendant may have been depressed and angry at the world after his forced discharge from the Navy and subsequent failure to adapt to civilian life, he has failed to present sufficient evidence that he suffered such an *extreme* impairment to warrant the imposition of concurrent life sentences.

The trial court concluded that two consecutive life terms were appropriate for the brutal slayings of Elaine Furey and Alfred Stafki. Defendant has presented no ground on which to conclude that these two consecutive life sentences exaggerate either his culpability or his criminality.

We hold that the trial court did not abuse its sentencing discretion and affirm the sentences imposed.

### III.

Both defendant and the State argue that the trial court erred when it formally adjudicated him guilty of all four counts of first-degree murder when there were only two victims. We agree.

Under Minn.Stat. § 609.04 (1994), "[a] defendant cannot legally be convicted of two counts of first-degree murder where both convictions were for the same offense on the basis of the same act involving the same victim." *State v. Ture*, 353 N.W.2d 502, 517 (Minn.1984). This court has consistently applied this principle. *See State v. Knowlton*, 383 N.W.2d 665, 670 (Minn.1986); *State v. LaTourelle*, 343 N.W.2d 277, 283–84 (Minn. 1984).

Accordingly, defendant is entitled to vacation of the two felony murder convictions that were formally adjudicated under Minn. Stat. § 609.185(3) (1994). However, defendant is entitled only to have the formal adjudications vacated. He is not entitled to vacation of the findings of guilt reflected in the trial court's order dated May 3, 1994. *See LaTourelle*, 343 N.W.2d at 284.

Affirmed as modified.