595 N.W.2d 520 (1999)
Larry Dewayne DAVIS, Appellant,
v.
STATE of Minnesota, Respondent.
No. C0-98-1183.
Supreme Court of Minnesota.
June 10, 1999.
*522 John M. Stuart, Minnesota State Public, Rochelle R. Winn, Assistant State Public Defender, Minneapolis, for appellant.
Michael A. Hatch, Minnesota Attorney General, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant County Attorney, Saint Paul, for respondent.
Heard, considered, and decided by the court en banc.

OPINION
BLATZ, Chief Justice.
Appellant Larry Dewayne Davis was found guilty of first-degree and second-degree murder, and attempted first-degree and second-degree murder. Although appellant pled not guilty by reason of insanity, the trial court rejected his insanity defense. Appellant was sentenced to life imprisonment for first-degree murder and to a consecutive 180-month term for attempted first-degree murder. On appeal, he argues that the evidence was insufficient to support his conviction for attempted first-degree murder, and that the trial court erred in rejecting his insanity defense. We affirm.
At about 10:45 p.m. on Saturday, May 24, 1997, appellant broke a window and entered the duplex apartment Joanne Kinne and Delores Fenske shared at 729 Edmund in St. Paul. Kinne was showering in the bathroom next to the kitchen. Brian and Theresa Allen, who lived in the upstairs apartment, heard the sound of breaking glass coming from the front of the duplex. After looking outside and seeing nothing unusual, Theresa telephoned Fenske. Fenske also noticed nothing unusual. Theresa called the police while Fenske, based on Theresa's phone call, warned Kinne to get out of the shower and dress.
Kinne got out of the shower and went to the bathroom door. She saw appellant standing behind Fenske near the kitchen sink. As Kinne reached behind the bathroom door to get her robe, appellant grabbed Fenske and wrapped a telephone cord around her. Fenske protested the appellant's actions, and Kinne shouted, "[w]hat do you want? Leave us alone." Appellant remained silent.
Fenske then fell or was pushed to the floor, blocking the bathroom doorway and Kinne's exit. Appellant grabbed a knife from the dish drainer in the sink and began stabbing Fenske in the head. He said nothing and stared directly at Kinne. When the blade of the knife broke off in Fenske's neck, appellant reached back into the dish drainer, grabbed another knife, and continued stabbing Fenske. Kinne lunged at appellant to stop him from stabbing Fenske. Appellant made an overhand stabbing motion toward Kinne before realizing that the second knife blade had also broken off. He fumbled in the dish drainer apparently looking for a third knife, but none were left.
Upstairs, Theresa Allen heard Kinne yelling, "[l]eave us alone. What do you want? Just leave us alone." Theresa rushed down the apartment's back steps and toward Kinne's apartment while Brian called 911. As Kinne heard Theresa coming down the back steps, appellant jumped up and ran toward the living room. Kinne ran to her apartment's back door. Before Theresa reached Kinne's apartment, a hysterical Kinne flew out of her apartment. They went upstairs, and Brian relayed the information to 911.
Officer David Titus arrived at 10:55 p.m. and noticed a broken window. Inside the apartment, the officer found Fenske on the kitchen floor but did not find appellant. A canine unit was called to the scene. Although the dog picked up a scent at the *523 rear of the duplex, the dog lost the scent a block from the crime scene.
Approximately ten minutes later, police responded to a call reporting a suspicious person in an alley three blocks from the crime scene. Ian Hedberg was visiting friends in the area, and he reported to police that he saw a man standing at the end of an alley and looking around as if he wanted to hide while police sirens wailed nearby. Police could not locate the unidentified man reported by Hedberg.
At 12:10 a.m., Officer Catherine Pavlak saw a man walking about seven blocks from the crime scene. After reviewing the description of the stabbing suspect, Pavlak stopped appellant. Appellant told Pavlak that he was coming from his girlfriend's house and going to White Castle. Pavlak continued talking to appellant until Officers Thomas Arnold and Patrick Scott arrived. Upon arriving, both officers noticed dirt, sand, and leaves on appellant's arms and clothes, and blood on appellant's jeans. DNA testing later showed that samples of the blood matched Fenske's blood. Appellant initially was compliant as Pavlak guided him to the squad car, but he tried to grab Arnold's gun when Scott tried to handcuff him. A struggle ensued, with appellant trying to grab the officers' guns. After appellant was subdued, Hedberg came to the car and identified appellant as the person in the alley.
Shortly after appellant's arrest, police showed Kinne a six-person photo lineup at St. Paul police headquarters. She immediately identified appellant as the intruder who assaulted Fenske and her.
Fenske died at 1:30 a.m. the morning following her attack. An autopsy revealed 30 sharp force injuries to Fenske's head, neck, face, and hands. The examiner testified that the injuries were consistent with the victim lying on the floor and trying to resist attack. The cause of death was loss of blood due to multiple force injuries.
Appellant pled not guilty by reason of insanity, and the court held a bifurcated bench trial. After the first phase of the bench trial, appellant was found guilty of first-degree murder and attempted first-degree murder. The trial then entered its second phase to determine whether appellant was legally mentally ill when he committed the crimes.
During the second phase of the trial, appellant presented evidence that he has a family history of mental illness. Both appellant's father and aunt have been hospitalized for mental illnesses. Appellant first exhibited symptoms of mental illness on November 1, 1996. On that day, he complained to his mother that voices from the television and radio told him that he and his family were going to hell.
The next morning, while visiting an apartment rental agency, appellant assaulted an office worker without provocation. The police were called and appellant was taken to United Hospital. There, he assaulted four staff members and another patient. Appellant was transferred to St. Paul-Ramsey Medical Center, where Dr. Daniel Larson conducted a Rule 20 evaluation of appellant and concluded that he suffered from a psychosis.
A commitment hearing was held on November 26, 1996. Two court-appointed examiners recommended that appellant be committed. The court found that appellant was mentally ill and chemically dependent, and committed him to the Anoka-Metro Regional Treatment Center. While there, he was placed on Haldol, a psychotropic drug used to manage psychosis. Appellant did not complain of psychotic symptoms while on Haldol, and no symptoms were observed by the staff.
Appellant was provisionally discharged from Anoka-Metro Regional Treatment Center to live with his mother on January 28, 1997. Upon discharge, he was given a case manager, Audrey Fischer, who assisted him in finding an apartment and securing financial assistance. According to Fischer, she and appellant talked about his *524 mental illness symptoms and what to do if they should reappear.
On April 11, 1997, appellant met with his outpatient psychiatrist. Appellant, having reduced his dosage of Haldol on his own, wanted to discontinue taking Haldol. The doctor told appellant to continue taking Haldol but to reduce his dosage of Cogentin, a drug used to counter Haldol's side effects. Misunderstanding the doctor's instructions, appellant discontinued all medications.
Fischer last saw appellant on May 16, 1997. At that time, appellant did not report hearing voices or exhibit any symptoms of mental illness. However, on May 23, the day before his attack on Fenske, appellant skipped his appointment with Fischer.
Tiffany Coddon, appellant's former girlfriend, was the last person known to spend time with appellant before the homicide. Coddon gave appellant a 15-minute ride to Edmund and Dale Streets during the afternoon of May 24, and did not notice him behaving strangely.
Officer Pavlak, who stopped appellant about 90 minutes after the crime, is the first person known to have spoken to appellant after the homicide. Appellant did not mention hearing voices, and Pavlak did not perceive that appellant was responding to things that were not there. A paramedic, a nurse, and the various doctors who attended to appellant after the altercation with police also did not notice signs that appellant was hallucinating or delusional.
Appellant spoke to investigators two days later, explaining that voices told him that his family was dead and in hell, and that he could join them by dying. The voices told appellant that "the Dude" would kill him if he broke into the house next door. After hearing the voices, appellant waited for a few minutes, and then went next door and kicked in the window. When the Dude didn't shoot him, appellant wandered through the house. He believed that the Dude would come if he stabbed Fenske, so he grabbed a knife and began stabbing her. When the Dude didn't come, appellant left through the window and hid in some bushes because he knew police were looking for him. Appellant also stated that he fought with the police because voices told him that he would be shot if he went for their guns.
During his interview with police, appellant acknowledged that his acts were wrong and that he would not do them again. He asked the officer to apologize to his mother and the people at 729 Edmund.
Appellant was admitted to the St. Peter Regional Treatment Center for a Rule 20 evaluation six days after the stabbing. Dr. Michael Farnsworth, a psychiatrist and the medical director of the treatment center, and Dr. Kristin Kienlen, a staff psychologist at the treatment center, were part of the treatment team that met weekly with appellant. During the evaluation, appellant reported hearing voices but did not seem preoccupied with them, and was able to differentiate between real and unreal. He did not report command hallucinations, and told Dr. Farnsworth that he would not comply with the voices because "the voices lie." Dr. Kienlen also did not observe any bizarre, unusual, or disorganized behavior by appellant. According to Dr. Kienlen, psychological tests administered to appellant suggested that he was feigning or exaggerating his symptoms of mental illness.
Upon the conclusion of the evaluation, appellant was given an Axis 1 diagnosis of paranoid schizophrenia, alcohol dependence, and cannabis dependence, and an Axis 2 diagnosis of antisocial personality disorder. Dr. Farnsworth and Dr. Kienlen both opined that appellant was not legally insane when he killed Fenske as he exhibited an ability to plan during the crime and he attempted to elude police after the crime. In both doctors' opinions, appellant did not exhibit the symptoms of an individual who is acutely psychotic or schizophrenic.
*525 Appellant presented two expert witnesses, Dr. Daniel Dossa and Dr. Dennis Philander. Dr. Dossa interviewed appellant twice and concurred with the Axis 1 diagnosis of schizophrenia. However, in contrast to the state's experts, Dr. Dossa opined that appellant was acting pursuant to oratory hallucinations and delusional thought processes at the time of the crimes. He testified that appellant met the test for legal insanity because appellant's actions were in response to command hallucinations which continued through his struggle with the police. He based his opinion on appellant's history of unprovoked assaults, appellant's discontinuing his medication, appellant's "bizarre" description of the evening's events, the fact that appellant's actions served no purpose, and the fact that appellant did not attempt to hide his involvement in the crime by changing his clothes. However, Dr. Dossa admitted that his opinion could have been affected by two facts appellant did not tell him  that Fenske was on the ground before appellant began stabbing her[1] and that appellant left the apartment after noise sounded from the back stairs.
Dr. Philander concurred with the Axis 1 diagnosis of paranoid schizophrenia and chemical dependency, adding that appellant's symptoms were present with such intensity that his entire reality was impaired. Dr. Philander stated that appellant was experiencing delusions at the time of the crime and during his interviews with police because he had stopped taking Haldol. He testified that appellant was acting pursuant to command hallucinations that did not allow for choice. On cross-examination, Dr. Philander acknowledged explaining the legal insanity standard to appellant during their first interview, creating a concern about appellant tailoring descriptions of his symptoms to match the standard. However, Dr. Philander did not think that appellant was exaggerating his symptoms based on appellant's consistent explanations of his behavior.
On this record, the trial court found that appellant should not be excused from criminal responsibility by reason of mental illness.

I.
Appellant first contends that the evidence was insufficient to support his conviction of attempted first-degree murder. In reviewing a sufficiency of the evidence claim, we view the evidence in a light most favorable to the verdict to determine "whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." State v. Moore, 481 N.W.2d 355, 360 (Minn.1992). "We review criminal bench trials the same as jury trials when determining whether the evidence is sufficient to sustain convictions." State v. Hough, 585 N.W.2d 393, 396 (Minn.1998).
A person is guilty of attempted murder when he or she, "with intent to commit a [murder], does an act which is a substantial step toward, and more than preparation for, the commission of the [murder]." Minn.Stat. § 609.17, subd. 1 (1998); see also State v. Gisege, 561 N.W.2d 152, 156 (Minn.1997). Appellant argues that the evidence does not support the trial court's findings both that he had the intent to kill Kinne and that he took a substantial step toward killing her.
We turn first to whether the evidence is sufficient to support the trial court's finding that appellant had the intent to commit first-degree murder. Intent may be proved by circumstantial evidence including the defendant's conduct, *526 State v. Whisonant, 331 N.W.2d 766, 768 (Minn.1983), and the character of the assault, State v. Steinbuch, 514 N.W.2d 793, 800 (Minn.1994). Further, intent may be inferred from events occurring before and after the crime. State v. Andrews, 388 N.W.2d 723, 728 (Minn.1986).
In this case, Kinne testified that appellant was repeatedly stabbing Fenske in the head while staring directly at Kinne. When Kinne lunged at appellant to stop him from stabbing Fenske, he raised the knife and made an overhand stabbing motion towards Kinne. Realizing that the knife blade had broken off while he was stabbing Fenske, appellant reached back into the dish drainer, where he had already found two knives. However, when noises sounded from the apartment's back stairs, appellant bolted. Viewing these facts most favorably to the decision, we hold that the trial court could reasonably conclude from appellant's conduct and the surrounding circumstances that he intended to murder Kinne.
We turn next to whether the evidence is sufficient to support the trial court's finding that appellant took a substantial step, more than preparation, toward murdering Kinne. There need not have been actual injury to the victim in order to support the trial court's finding that appellant took a substantial step toward completing the crime. See generally Whisonant, 331 N.W.2d at 768 (convicting defendant of attempted murder when defendant shot at but missed victim).
In this case, the trial court could have reasonably found that appellant's motions showed an attempt to stab Kinne that was frustrated only by the knife's blade already being broken off. Although appellant did not actually inflict physical harm on Kinne, his actions are analogous to a defendant who shoots at but misses his victim. Further, the trial court could have concluded that appellant then searched the dish drainer for another knife to stab Kinne with before he was scared away by noise on the back stairs. In light of appellant's overhand motion toward Kinne with the broken knife and his subsequent search of the dish drainer, we hold that the trial court could reasonably have found that appellant took a substantial step toward murdering Kinne.

II.
Appellant next argues that the trial court erred in finding that appellant failed to prove that he was mentally ill at the time that the crimes were committed. On appeal, we "conduct[] `a rigorous review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the [trial court] to reach its conclusion.'" DeMars v. State, 352 N.W.2d 13, 16 (Minn.1984) (quoting State v. Mytych, 292 Minn. 248, 252, 194 N.W.2d 276, 279 (1972)).
In order to be excused from criminal liability by reason of insanity, a defendant must prove by a preponderance of the evidence that he was laboring under a defect of reason due to mental illness or deficiency such that he either did not know the nature of his act or did not know that the act was wrong. Minn.Stat. § 611.026 (1998); State v. Wilson, 539 N.W.2d 241, 244 (Minn.1995). Both expert and lay testimony are admissible, and the fact finder has broad discretion to determine the appropriate weight to assign expert psychiatric testimony. Wilson, 539 N.W.2d at 244-45. The trial court may also "consider evidence that relates to cognition, volition, and capacity to control behavior." Id. at 244.
In the instant case, the trial court found that appellant suffers from paranoid schizophrenia and antisocial personality disorder. It then summarized the testimony of the people known to have talked to appellant directly before and after the attack, including appellant's social worker, his ex-girlfriend, and the medical personnel who attended to appellant after his arrest. The court found that none of these *527 people noticed appellant exhibiting symptoms of psychosis. Further, the court credited highly the state's experts' opinions.
The state's two experts, who began meeting with appellant six days after the attack and met with him regularly for 90 days, concluded that appellant was not mentally ill under the statutory standard. Dr. Farnsworth testified that although appellant complained about hearing voices, appellant did not demonstrate corroborative or reactive behaviors supporting his claim. Moreover, both Dr. Farnsworth and Dr. Kienlen agreed that appellant's actions surrounding the attack reflected a thought process that included consideration of alternative choices. Finally, psychological tests suggested that appellant was feigning or exaggerating mental illness symptoms.
Appellant's experts contradicted the state's experts. Dr. Dossa testified that appellant experienced oratory hallucinations and paranoid and persecutory delusions that significantly impaired his ability to understand both the nature and wrongfulness of his acts. Dr. Philander opined that appellant believed on the day of the crime that his family was in hell and that in order to join them he had to follow the Dude's directive to kill Fenske. Dr. Philander therefore stated that although appellant knew the nature of his acts, he could not appreciate the wrongfulness of his conduct.
In addition to assessing expert witness testimony, the trial court can look to events surrounding the crime in making a determination about appellant's sanity. Wilson, 539 N.W.2d at 245-46. In this case, the trial court was presented with significant evidence indicating that appellant knew the nature of his acts and their wrongfulness at the time of the murder. Upon hearing voices, appellant paused for a few minutes in the neighboring apartment before breaking into Kinne's apartment, giving him time to reflect on his actions. After stabbing Fenske, appellant fled the crime scene as someone descended the back steps, arguably to avoid being caught. He then hid in bushes to avoid being detected by police. After being discovered, he lied to Officer Pavlak and then struggled with police. Two days after the incident, when being questioned by police detectives, appellant stated that he was sorry, that he knew his actions were wrong, and that he would not do them again if he could go back in time.
In this case, there was ample evidence to justify the trial court's rejection of appellant's claim that his mental illness prevented him from understanding the nature of his acts and that they were wrong. Therefore, we hold that there is sufficient evidence to support the trial court's conclusion that appellant was not so mentally ill at the time he committed the offenses as to be excused for his culpable behavior. Appellant's convictions for first-degree murder and attempted first-degree murder are affirmed.
Affirmed.
NOTES
[1] Dr. Dossa testified that knowing that Fenske was on the ground before appellant began stabbing her could have impacted his decision because appellant stated to Dr. Dossa during one of their interviews, "I know it was wrong after I [stabbed Fenske], after she fell to the floor."