STATE OF MINNESOTA

IN SUPREME COURT

A14-2039

Hennepin County                                                        Anderson, J.
                                                              Took no part, Hudson, J.


State of Minnesota,

                    Respondent,

vs.                                                                Filed: March 16, 2016
                                                              Office of Appellate Courts
Ishmael Roberts,

                    Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

The district court did not clearly err by finding that appellant failed to prove, by a preponderance of the evidence, that appellant did not know his acts were morally wrong at the time that he murdered two of his family members.

Affirmed.

1

O P I N I O N

ANDERSON, Justice.

After the first phase of a bifurcated court trial on stipulated facts, appellant Ishmael Roberts was found guilty of two counts of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2014), for the stabbing deaths of two of his family members: his adoptive grandmother,[1] B.W., and 14-year-old P.W. After the second phase of the bifurcated trial, in which the district court heard testimony from psychiatric experts, the district court found that Roberts failed to establish a mental-illness defense under Minn. Stat. § 611.026 (2014). The district court sentenced Roberts to life in prison without the possibility of release. Minn. Stat. § 609.185(a). Roberts now appeals the district court's rejection of the mental-illness defense. The issue presented on appeal is whether the district court clearly erred by finding that Roberts failed to establish, by a preponderance of the evidence, that he did not know that his acts were morally wrong at the time of the murders. Because the district court did not clearly err, we affirm.

I.

Roberts was born in Liberia in 1989. Sometime between the ages of 15 and 17, Roberts was adopted by B.W. and moved to Minnesota. Roberts lived with B.W. in Minneapolis from 2006 to 2009. In 2009, Roberts moved to Oregon to live with other family members. The record of Roberts's mental health issues begins on February 17, 2010, when police in Oregon responded to a report of Roberts chasing his sister with a

---

[1] The record is unclear and inconsistent regarding whether B.W. was the adoptive "grandmother" or the adoptive "mother" of Roberts.

knife, jumping from a third-floor balcony, and stating that he wanted to kill himself. Roberts was hospitalized in Oregon and diagnosed with paranoid schizophrenia. On September 15, 2010, sometime after Roberts returned to Minnesota, witnesses saw Roberts talking to himself and swinging his legs over the side of a bridge. Police detained Roberts and admitted him to a hospital in Minnesota. A physician diagnosed Roberts with "acute psychosis." On October 7, 2010, police admitted Roberts to a hospital after receiving complaints that he had harassed people in a parking lot. During his hospital stay, Roberts reported that he was living on the street; that he was not getting along with his adoptive grandmother, B.W.; and that B.W. and other family members were "imposter[s]." Medical staff identified the following as possible diagnoses: paranoid schizophrenia, substance-induced psychosis, and psychosis not otherwise specified.

On July 8, 2012, in South Dakota, a police officer stopped a vehicle driven by Roberts for speeding. Roberts stated that he was driving to Minneapolis. After learning that the vehicle was stolen, the officer arrested Roberts. A search of the vehicle revealed marijuana, a pistol, black bandanas, black gloves, a gas mask, and a machete. Roberts was released from custody on October 26, 2012. The items recovered from the vehicle were not returned to Roberts. After his release, Roberts boarded a bus to Oregon, but left the bus in Montana, where he convinced a ticket agent to change his destination to Minneapolis. Roberts boarded a new bus and arrived in Minneapolis near midnight on October 27, 2012.

Two days later, at 4:28 a.m. on October 29, 2012, police responded to a stabbing in Minneapolis at B.W.'s home. B.W. and P.W. were found dead at the scene. B.W. suffered 12 stab wounds and 48 incision wounds. P.W. suffered 7 stab wounds and 52 incision wounds, including a 22-centimeter incised neck wound that nearly severed his head. For both victims, the cause of death was sharp-force injury and the manner of death was homicide. Next to P.W.'s feet, police found a long black sheath that could have been used to hold a sword or a machete. No corresponding blade was recovered.

B.G., a resident of B.W.'s home, had seen Roberts earlier that morning at 3:00 a.m., sitting in B.W.'s living room, wearing a black winter hat and black clothes. B.G. recognized Roberts because Roberts previously resided in the home. Roberts appeared "upset," acknowledged B.G. with a head nod, and told B.G. that he was tired. B.G. returned to sleep in the basement and did not wake up until he heard police officers in the home. C.K., another resident of the home, awoke in the early morning of October 29, 2012, to the sound of screaming. C.K. observed an unknown male in a black hoodie and skull-like mask stabbing B.W. with a long knife. C.K. fled to a neighbor's house to call 911.

After arriving at the murder scene, police observed that B.W.'s car was missing. That night, police located the car at a rollover accident in Waterloo, Iowa. Witnesses observed a male driver leave the car and flee on foot. Several blocks away, police located the driver, later identified as Roberts, and ordered him to the ground. Roberts did not comply and instead walked away. Roberts stated that he understood the order but that

4

he was not going to stop walking. An officer fired a Taser at Roberts and detained him. Roberts stated that he knew his rights and refused to identify himself.

Police determined that Roberts was wearing clothing sold at a Target in Waterloo, Iowa. At this Target, police recovered a pair of black, blood-stained dress shoes from a trash can near the entrance. Surveillance video from that entrance showed Roberts dropping the shoes into the trash can. An analysis of blood on the shoes revealed a DNA profile matching P.W. Police also determined that the shoes Roberts wore at the time of his arrest, Converse sneakers, were stolen from a Shoe Carnival in Waterloo. Surveillance video from October 29, 2012, showed Roberts entering the Shoe Carnival at 2:39 p.m. wearing dark-colored dress shoes, and leaving at 3:00 p.m. wearing the same dress shoes. Police found an empty shoebox and a piece of fabric with a security tag at the Shoe Carnival, both of which matched the Converse sneakers that Roberts was wearing. Police also recovered a car floor mat, consistent with B.W.'s car, from a dumpster behind the Shoe Carnival. The car floor mat contained a blood-like substance.

At approximately 7:00 p.m. on the night after the murder, Roberts was escorted into a holding cell at the Waterloo police station. Roberts briefly screamed inaudible words at an officer as the cell door closed, and then he fell asleep. Officers entered the cell twice that night to conduct a search, to take photographs, and to ask Roberts to change into an orange jumpsuit. Roberts was cooperative with all commands, except he refused to wear jail-issued socks.

The next morning, October 30, 2012, at 5:00 a.m., officers from the Minneapolis Police Department interviewed Roberts at the Waterloo police station. Roberts

5

understood that he was in Iowa, claimed that he had no family, and stated that he did not remember the rollover crash. Roberts then invoked his right to counsel, stating "I would need a, I would need [an] attorney first before [I] have any conversation." The police officers terminated the interview. Later that day, when advised of the murder charges against him, Roberts stated, "I will be spending my life going from jail to jail."

On November 29, 2012, Roberts was booked into the Hennepin County Jail. Roberts reported that he felt things crawling up his nose and that he heard voices telling him to "sell his soul." On January 30, 2013, Roberts reported to a psychiatrist at the jail that he was being followed by the FBI and that he was receiving instructions through the television. The psychiatrist diagnosed Roberts with schizophrenia, paranoid type, and psychosis not otherwise specified.

On February 1, 2013, the district court ordered a Rule 20.01 competency examination. *See* Minn. R. Crim. P. 20.01. The court-appointed psychologist, Dr. Panciera, found that Roberts was incompetent to proceed at trial. After Roberts participated in a treat-to-competency program, the district court found Roberts competent to proceed. On November 12, 2013, Dr. Panciera issued a Rule 20.02 report,[2] concluding that Roberts suffered from paranoid schizophrenia and that, at the time of the murders, Roberts "was not able to understand his actions and their moral implications realistically or rationally." The State hired Dr. Wernsing to conduct an additional Rule 20.02

---

[2]     Under Minn. R. Crim. P. 20.02, subds. 2, 4(b), the district court may appoint an examiner to issue an opinion as to "whether, because of mental illness or deficiency, the defendant, at the time of committing the alleged criminal act, was laboring under such a defect of reason as not to know the nature of the act or that it was wrong."

6

examination.    Dr. Wernsing diagnosed Roberts with substance-induced psychosis in remission.  He opined that Roberts knew that his actions were wrong based in part on his conduct shortly before and after the murders.

After the first phase of a bifurcated court trial on stipulated facts, the district court found Roberts guilty of two counts of first-degree premeditated murder.  After the second phase, in which the district court heard expert psychiatric testimony, the district court rejected Roberts's mental-illness defense.  Although Roberts "suffered from a mental illness," the district court found that Roberts did not establish a mental-illness defense, Minn. Stat. § 611.026, because Roberts failed to prove, by a preponderance of the evidence, that he did not know the nature of his acts or that they were morally wrong at the time of the murders.

## II.

A criminal defendant is presumed sane and responsible for his acts, *see* Minn. Stat. § 611.025 (2014), and bears the burden of proving a mental-illness defense by a preponderance of the evidence, *State v. Linder*, 304 N.W.2d 902, 907 (Minn. 1981).  The mental-illness defense in Minnesota follows the *M'Naghten* rule,[3] *see State v. Odell*, 676 N.W.2d 646, 647 (Minn. 2004), which is codified by statute:

---

[3]    In *M'Naghten's Case*, the English House of Lords held that to establish an insanity defense, the defendant must prove that "at the time of the committing of the act, [the defendant] was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." *M'Naghten's Case* (1843) 8 Eng. Rep. 718, 722, 10 Cl. & Fin. 200, 210.

7

No person having a mental illness or cognitive impairment so as to be incapable of understanding the proceedings or making a defense shall be tried, sentenced, or punished for any crime; but the person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from one of these causes, as not to know the *nature* of the act, or that it was *wrong*.

Minn. Stat. § 611.026 (emphasis added). The word "wrong" in this statute is "used in the moral sense." *State v. Bott*, 310 Minn. 331, 336, 246 N.W.2d 48, 52 (1976). This means that a "defendant must know that his act was wrong in a moral sense and not merely know that he has violated a statute." *State v. Ulm*, 326 N.W.2d 159, 161 (Minn. 1982). It is undisputed that Roberts suffered from a "mental illness,"[4] and that Roberts knew the "nature" of his acts.[5] Therefore, the narrow issue on appeal is whether the district court clearly erred by finding that Roberts failed to prove, by a preponderance of the evidence, that he did not know that his acts were morally wrong at the time of the murders.

The application of the mental-illness defense is a question of fact to be resolved by the factfinder. *See State v. Brom*, 463 N.W.2d 758, 764 (Minn. 1990). Therefore, a finding that a defendant failed to meet his or her burden to prove a mental-illness defense should not be disturbed unless it is clearly erroneous. *See Ulm*, 326 N.W.2d at 161. A factual finding is clearly erroneous if it does not have evidentiary support in the record or

---

[4]     The district court found that Roberts "has suffered from a mental illness since 2010 which has at various times been in remission."

[5]     The district court found that Roberts "knew the nature of his actions." Roberts's own expert, Dr. Panciera, agreed that Roberts knew "in a concrete sense" that he was physically striking B.W. and P.W. multiple times with a machete.

if it was induced by an erroneous view of the law. *See id.*; *see also Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999). We have also stated that a factual finding is clearly erroneous only if we are "left with the definite and firm conviction that a mistake has been made." *Fletcher*, 589 N.W.2d at 101 (quoting *Gjovik v. Strope*, 401 N.W.2d 664, 667 (Minn. 1987)). We grant "[b]road deference . . . 'to the fact-finder in determining the appropriate weight to assign expert psychiatric testimony.' " *Odell*, 676 N.W.2d at 648-49 (quoting *Brom*, 463 N.W.2d at 764). Moreover, the factfinder is not bound by expert psychiatric testimony and may reject it entirely, even when the only experts who testify support the defendant's assertion of a mental-illness defense. *DeMars v. State*, 352 N.W.2d 13, 16 (Minn. 1984).

The evidence from the mental-illness phase of trial included testimony and reports from several psychiatric experts. Dr. Panciera, testifying for the defense, opined that Roberts suffered from paranoid schizophrenia and that at the time of the murders, he "was psychotic and experiencing a number of significant delusional thoughts, beliefs about the victims and that it was because of his delusional thinking that he did what he did." These delusional thoughts by Roberts included: hearing voices and receiving messages from televisions; feeling bugs invade his nose; believing that B.W. had "magical power," "practiced witchcraft," and would sexually assault him in his bed at night; thinking that he was under attack by his family; and thinking that he had to "fight for his soul" against his family, who had "malevolent intentions towards him and [were] trying to destroy his life and his very soul." Dr. Panciera concluded that Roberts's "understanding of what he was doing was highly unrealistic and irrational because of his

9

mental illness. He was not able to understand his actions and their moral implications realistically or rationally."

By contrast, the State's psychiatric expert, Dr. Wernsing, concluded that Roberts suffered from substance-induced psychotic disorder in remission, and that Roberts knew that his actions were wrong based on his conduct before and after the murders, such as concealing his acts and his identity with dark clothing and a mask; disposing of evidence such as the blood-stained shoes and car floor mat; fleeing the murder scene; and showing awareness that he would be "spending [his] life going from jail to jail." Dr. Wernsing further opined that Roberts's behavior did not indicate that he was acutely psychotic at the time of the murders, and that if such acute psychosis had been present, it would have continued and been observable in jail the day after the murders.

The district court also considered circumstantial evidence of Roberts's mindset through his behavior before and after the murders,[6] such as planning, concealing his identity, fleeing and evading capture, disposing of evidence, and showing awareness of consequences. For example, police found black clothing, a gas mask, and a machete in Roberts's possession four months before the murders. During the murders, Roberts used

---

[6]     The district court found that "[b]ecause [Roberts] does not recall the time period when he murdered two people, and because no witnesses testified to their perception of [his] mindset at the time of the offense, there is no direct evidence that he did not know the moral ramifications of his conduct." Thus, the district court considered circumstantial evidence of Roberts's mindset, including his conduct before and after the murders. *See Davis v. State*, 595 N.W.2d 520, 527 (Minn. 1999) ("[T]he trial court can look to events surrounding the crime in making a determination about appellant's sanity."); *State v. Wilson*, 539 N.W.2d 241, 245 (Minn. 1995) ("[C]ircumstances surrounding the crime may shed light on defendant's mental state at the time of the murders.").

10

dark clothing, a mask, and a long knife, and a machete sheath was found at the scene. After the murders, Roberts stole a vehicle and fled out of state. Roberts disposed of his bloody dress shoes and a car floor mat in trash containers, and obtained clean clothing and shoes. When confronted by police, Roberts refused to identify himself and resisted arrest. In addition, the day after the murders, Roberts indicated an awareness of the consequences of his behavior when he referred to "spending [his] life going from jail to jail." Moreover, there is no direct evidence that Roberts was suffering from an acute psychotic episode at the time of the murders.

In several cases, we have affirmed a district court's rejection of a mental-illness defense based in part on a defendant's behavior before and after crimes, such as planning and concealment, flight from authorities, disposal of evidence, and expressing awareness of consequences. *See, e.g.*, *State v. Peterson*, 764 N.W.2d 816, 820 (Minn. 2009) (defendant called 911, apologized, and acknowledged consequences); *Davis v. State*, 595 N.W.2d 520, 522-24, 527 (Minn. 1995) (defendant fled the crime scene, hid in bushes, struggled with police, apologized, and acknowledged that his actions were wrong); *State v. Wilson*, 539 N.W.2d 241, 245-46 (Minn. 1995) (defendant planned and concealed a stabbing, cleaned the knife with bleach, and sold a car used for the crime); *DeMars v. State*, 352 N.W.2d 13, 15-16 (Minn. 1984) (defendant acted calmly, tried to dispose of the body and blood-soaked jeans, and tried to wash blood off the car).

Roberts relies heavily on *State v. Rawland*, in which we reversed the conviction of a defendant who committed a crime during an "extended period of mental illness" in which he was "so out of touch with reality that he must have acted without knowing

11

whether the act was right or wrong" when he murdered his father. 294 Minn. 17, 41-42, 199 N.W.2d 774, 787 (1972). The defendant's delusions included plots by his parents to kill him; announcing his candidacy for U.S. president; swimming to Canada to escape assassination; and attempting to send messages to the world through his AM radio. *Id.* at 19-21, 41, 199 N.W.2d at 776-77, 787-88. The State correctly argues that *Rawland* is distinguishable. In *Rawland*, "[a]ll experts agreed [that Rawland] had a serious mental disease . . . at the time of the event"; "[a]ll experts agreed that he did not have the ability to control his actions at the moment the offense was committed" and that he "lacked the capacity to freely and deliberately choose to commit the act"; and "[a]ll experts inferred that . . . he was not at the time able to distinguish between right and wrong." *Id.* at 41-42, 199 N.W.2d at 788. Here, by contrast, it is undisputed that Roberts knew the "nature" of his acts; the experts are divided on the type, severity, and remission of Roberts's mental illness; and the experts are divided on Roberts's knowledge of moral wrongfulness.

In this case, the burden was on Roberts to establish, by a preponderance of the evidence, that he did not know his acts were morally wrong at the time the murders occurred. Roberts presented no direct evidence, however, of his mindset during the murders. Therefore, the district court appropriately considered circumstantial evidence of Roberts's mindset through expert psychiatric opinions, in addition to his conduct before and after the murder, as discussed above.[7] Although Dr. Panciera inferred that Roberts

<hr/>

[7] Roberts argues that the district court improperly considered Roberts's evasive conduct, because such conduct suggests knowledge of a "legal" wrong rather than a "moral" wrong. *See Ulm*, 326 N.W.2d at 161 ("[T]he defendant must know that his act

(Footnote continued on next page.)

did not know his conduct was wrong based on schizophrenic symptoms before and after the murders, such as hallucinations and delusional thoughts of threats or attacks by his family, his testimony was contradicted by other evidence, and the district court was free to reject aspects of Dr. Panciera's testimony.[8] In addition, there is no direct evidence indicating that Roberts was acutely psychotic at the time of the murders. Moreover, the district court's finding is supported by the State's expert, Dr. Wernsing, who opined that Roberts suffered from substance-induced psychosis in remission, and that Roberts's conduct shortly before and after the murders indicated an understanding of the wrongfulness of his acts. We afford substantial deference to the district court's evaluation

---

(Footnote continued from previous page.)
was wrong in a moral sense and not merely know that he has violated a statute."). We disagree for two reasons. First, there is no direct evidence that Roberts was exclusively aware of a legal wrong, versus a moral wrong (or both a legal and a moral wrong), and the district court may draw reasonable inferences from circumstantial evidence. *See Wilson*, 539 N.W.2d at 245 ("[C]ircumstances surrounding the crime may shed light on defendant's mental state at the time of the murders."). Concealing one's identity, fleeing a crime scene, hiding evidence, resisting arrest, and showing awareness of consequences, can be reasonably interpreted to indicate knowledge of a moral wrong. Legal and moral wrongfulness are not mutually exclusive concepts, but rather overlap to a great extent, because laws defining criminal activity are largely reflective of the moral standards of society. *See State v. Bott*, 310 Minn. 331, 336, 246 N.W.2d 48, 52 (1976). Second, even without *any* of the circumstantial evidence related to Roberts's evasive behavior, Roberts would still have failed to establish the mental-illness defense. The burden was on Roberts to produce a preponderance of evidence that he *did not know* that his conduct was morally wrong at the time of the murders. As we conclude, the district court did not clearly err by finding that Roberts failed to meet this burden.

[8] The district court also found that "the sincerity of [Roberts's delusional statements] regarding threats from his family" was "questionable" because it was "not until 2013, after he was charged with [murder] . . . that [Roberts] and his attorneys began reporting delusions of threats to his life and his soul," even if Roberts had previously referred to family members as "imposters" that practiced "witchcraft."

of the evidence of mental illness and the weight to assign to expert psychiatric testimony. *See Odell*, 676 N.W.2d at 648-49; *Linder*, 304 N.W.2d at 907. We hold that the district court did not clearly err by finding that Roberts failed to establish, by a preponderance of the evidence, that he did not know his acts were morally wrong at the time of the murders.

Affirmed.

HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.