IN THE SUPREME COURT OF NORTH CAROLINA

No. 33A24

Filed 21 March 2025

STATE OF NORTH CAROLINA

v.

TRISTAN NOAH BORLASE

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 292 N.C. App. 54 (2024), finding no error after appeal from judgments entered on 3 March 2022 by Judge R. Gregory Horne in Superior Court, Watauga County. Heard in the Supreme Court on 25 September 2024.

*Jeff Jackson, Attorney General, by Heidi M. Williams, Special Deputy Attorney General, for the State-appellee.*

*Lisa Miles for defendant-appellant.*

BERGER, Justice.

Defendant killed his mother and father one month prior to his eighteenth birthday. After being convicted of two counts of first-degree murder, defendant was sentenced to two consecutive life sentences without the possibility of parole. Defendant argued to the Court of Appeals that he was sentenced in violation of the Eighth Amendment as interpreted in *Miller v. Alabama*, 567 U.S. 460 (2012), North Carolina's *Miller*-fix statute, and Article I, Section 27 of the North Carolina Constitution because, as a juvenile offender, his crimes did not reflect permanent

incorrigibility. The Court of Appeals rejected this argument, holding that there was no error in the sentences imposed by the sentencing court. We affirm the Court of Appeals.

## I.    Factual and Procedural Background

At the time of the events in this case, defendant was a senior in high school and was just shy of his eighteenth birthday. He was a pole vaulter on the track team, but defendant was struggling in school, and his parents were aware that he may not graduate because of his poor grades. On 10 April 2019, defendant's parents informed him that he would not be allowed to compete with the track team for the remainder of the season, and they took away his car keys and cell phone.[1]

Later that day, defendant was alone with his mother in the kitchen while his father was outside spreading mulch. Evidence presented at trial, including defendant's testimony and footage from home security videos, tended to show that defendant stabbed his mother with a kitchen knife multiple times. Mrs. Borlase sustained twelve sharp force injuries, blunt force injuries, and injuries consistent with strangulation. The medical examiner testified that Mrs. Borlase died from stab wounds to her chest and torso.

After killing his mother, security footage showed defendant running towards his father with a large knife. Defendant raised the knife and struck at his father

---

[1] Ironically, earlier that day during his civics class, defendant learned about the differences between the punishments for juveniles and adults in the justice system, including that juveniles could not receive the death penalty for murder.

cutting his upper left arm. Mr. Borlase fell as he attempted to run away. Defendant jumped on his father and stabbed him multiple times. As defendant began to walk away, he saw his father struggling to get up before collapsing back to the ground. Despite seeing that his father was still alive, defendant took no steps to render aid or to summon help. The medical examiner testified that, in addition to sharp force injuries, Mr. Borlase had signs of blunt force injuries to the back of the head. The medical examiner concluded that the cause of death was multiple stab wounds to the torso.

For the next two hours, defendant attempted to cover up his actions. Defendant tried to clean up or wash away his parents' blood. Defendant also attempted to drag his mother's body from the home by using a rope tied around her feet. When he was unsuccessful, defendant carried her body to the bed of a truck and repeatedly dropped her along the way. Defendant covered his mother's body with bags of mulch and a blanket and then went into the yard to conceal his father's body. Defendant took his father's wallet and then wrapped the body in a hammock and covered it with leaves.[2]

Defendant then drove to his grandmother's house to pick up his twelve-year-old brother. Defendant's grandmother and brother noted that defendant smiled and laughed, was acting "overly happy," and was "in a very good mood." Defendant drove

---

[2] Later that evening, while searching for her parents, one of defendant's sisters discovered her father's body concealed under the hammock.

his brother home. Defendant's brother asked about the blood on the floor of the house, and defendant said it was from cutting himself cleaning dishes. Defendant left home around 8:45 p.m., leaving his youngest brother alone, and went to hang out with his friends and smoke marijuana. Despite attempts to find alternative places to stay for the evening, defendant drove back home. When he pulled up near his driveway, defendant noticed his grandmother's car and other vehicles at the residence. Defendant turned around and left. The next morning, defendant made plans to flee, but he was apprehended crossing the border into Tennessee.

Defendant was subsequently indicted for, and convicted of, two counts of first-degree murder. A sentencing hearing was held pursuant to N.C.G.S. § 15A-1340.19B to determine the appropriate sentence. The sentencing court thereafter entered a written order which included findings of fact detailing defendant's actions in murdering his parents, the court made the following additional findings of fact:

1. Defendant was the son of the decedents. He was 17 years, eleven months old on April 10, 2019, the date of offense;

2. As permitted by statute, the Court has considered all evidence received during the guilt–innocence phase of the case. Further, the Court has afforded both sides an opportunity to present any additional relevant and probative evidence regarding sentencing;

3. In April of 2019, Defendant was unexpectedly picked up from school by his father. The parents had received a call from school personnel expressing concerns over Defendant's grades and participation at school, to the extent that his ability to graduate was in question. The parents decided to pick him up from school early

planning to talk with him about their growing concerns and to search for possible answers moving forward. As part of the discussion, the parents took the keys to his car and his cell phone. They also informed him that he would not be participating on the high school track team for the balance of the season;

4. Defendant had been accepted at Coastal Carolina University and had been in discussions with the University track coach regarding his planned participation with their pole vault team;

. . . .

9. After so viciously attacking his mother, Defendant did not render aid or summon medical assistance for his gravely injured mother despite the presence of a home phone;

10. After killing both parents, Defendant spent then spent almost two hours attempting to conceal his actions by the following: 1) Using a garden hose to wash blood from the front porch, house siding, and interior of the home. He then used towels to try to mop up the bloody water on the floor of the residence; 2) Drug his mother's body out of the residence and out onto the stone and mulch front walk. He then tied rope from a hammock around his mother's ankles and attempted to drag her body toward the driveway. Failing in that, he lifted the body up and drug it through mulch to the edge of the drive; 3) Placed his mother's body into the back of a pickup truck and drove the truck down to the bottom of the property and up into a wooded area thereby concealing his mother's body; 4) Wrapped his father's body up into a hammock and attempted to further conceal the body with leaves; 5) Packed bags with clothing and a sleeping bag that he subsequently took with him; 6) Removed blood-stained items from the home to include a rug and blinds;

11. Defendant then drove to his grandmother's house and picked up his youngest brother (age 12). Both his

grandmother and his brother noticed that Defendant was acting "overly happy" and in a very good mood. Defendant took the young brother into the home that still had blood on the floor and throughout areas of the residence. He later admitted that he had gone to pick up his brother out of fear that his grandmother would first drive to residence thereby discovering the scene;

12. Defendant then left the scene at approximately 8:45 PM and went to the high school where he hung out with friends and smoked marijuana. He then sent out messages trying to find a place to stay for the night. He planned to run away from the area and go to another state. Later that evening he drove back to the home, but upon approach he observed his grandmother's car at the property. He turned off his headlights and turned around heading back toward Boone. He passed multiple police officers responding toward the scene as he drove back into Boone and away from the scene;

13. The Court has allowed both sides the opportunity to present further evidence at this sentencing hearing. The State offered a number of victim impact statements both oral and written. The defense offered further testimony of Defendant and Defendant Sentencing Exhibits DS#1 – DS#7 inclusive;

14. The Court has not presumed the appropriateness of any particular sentence. Rather, the Court has considered and selected the appropriate sentencing alternative based solely upon a consideration of the circumstances of the offense, the particular circumstances of Defendant, and any mitigating factors under N.C.G.S. § 15A-1340.19B(c)(l)–(9);

Based upon consideration of these findings of fact and additional evidence received at the sentencing hearing, the sentencing court then made findings pursuant to N.C.G.S. § 15A-1340.19C(a) as follows:

a) Age at the time of offense: The Court finds that Defendant was 17 years and 11 months old on the offense date. He reached the age of adulthood only one month after committing these homicides;

b) Immaturity: Dr. Hilkey's report cites various general studies tending to indicate that the juvenile brain tends to develop slowly and that the brain does not become fully developed until later in adulthood. While undoubtedly true, there is no credible, specific evidence before the Court that Defendant suffered from any specific immaturity that would act to mitigate his decisions and conduct in this case. Accordingly, the Court does not find this factor to be a significant mitigating factor in this case;

c) Ability to appreciate the risks and consequences of the conduct: Based upon the credible evidence received, Defendant was capable of fully appreciating the risks and consequences of his conduct. The evidence shows that Defendant planned out, for at least a short period of time, his actions. This is demonstrated by Defendant going outside the home to check on his father's whereabouts and status prior to reentering the home moments before beginning the assault on his mother. It is further evidenced by his actions following the deadly assaults in that he took numerous actions to clean the scene and hide evidence. Finally, his actions in fleeing the scene and taking steps to avoid apprehension further point to his understanding and appreciation of the risks and consequences. Accordingly, the Court finds no mitigating value as to this factor;

d) Intellectual capacity: The evidence is undisputed that Defendant was a very bright and capable person. His total IQ score of 128 placing him in the 97 percentile proves this to be true. Clearly, Defendant was under no intellectual limitations. The defense seems to argue in sentencing that this high intellectual capacity and ability should be found as a mitigating factor. The Court believes this is a misinterpretation of this factor. Certainly, if an individual has limited intellectual

abilities or functioning, then this limitation should be consider in mitigation. However in this case, Defendant's far superior intellectual functioning acts to only underscore his ability to plan, understand, and appreciate his decisions and subsequent actions. The Court finds no mitigating value as to this factor;

f)[3] Prior record: Defendant has no prior record of criminal convictions. The Court does consider this fact to have substantial mitigating value;

g) Mental health: [The forensic psychologist]'s reports and Defendant's testimony indicate that Defendant continues to suffer from depression and anxiety related issues. Further, Defendant has developed symptoms consistent with PTSD only following this incident. Beyond that, [the forensic psychologist] found that there was no clear evidence of a psychotic disorder or any cognitive impairment. It is further likely that Defendant's depression was exacerbated by his persistent marijuana use in the two months leading up to the murders. Accordingly, the Court finds mitigating value to this factor as it relates to his depression;

h) Familial or peer pressure exerted upon the Defendant: In *Miller v. Alabama*, the majority placed emphasis on the negative family, home, environmental and peer influences a juvenile faced while growing up. The specific situations addressed in that and following cases included growing up exposed to a troubled childhood, lack of parental care and involvement, exposure to drugs and even violence. This would also include a situation in which the juvenile was not the "trigger-man" or his involvement in the killing was only tangential. None of the factors are present in this case. In fact, the very opposite is true. Defendant had the benefit of very loving, caring and nurturing parents. He benefited from being raised by parents who deeply loved

---

[3] The sentencing order did not contain a subparagraph (e); however, the sentencing court addressed the nine factors set forth in the statute. *See* N.C.G.S. § 15A-1340.19B(c) (2023).

him and all his siblings and who sacrificed beyond even reasonable measure to provide for their children's health, welfare, happiness, needs and even wishes. While the Defendant may have genuinely disagreed with the form of discipline (taking of privileges and interactive discussions), even he seemingly admits in his testimony that both his parents had his best interests and his very future at heart throughout. As to any tangential involvement in murders, that is clearly not the case here. Defendant killed both parents separately by his own hand. There is no credible evidence before the Court to support any finding of mitigation as to this factor;

i) Likelihood that the Defendant would benefit from rehabilitation in confinement: The Court acknowledges that rehabilitation services will be made available to Defendant while in custody. However, the Court finds relevant to this issue the Defendant's manipulative behaviors both before and, as evidenced in the jail recordings, after the offenses. These behaviors were noted by his sibling even as he faced corrective discipline at his mother's hand (i.e, shifting blame to siblings, smiling or smirking as he faced punishment). Further, even through this very hearing, Defendant has not demonstrated sincere remorse for his actions. Certainly, he has shed tears and expressed sorrow or sadness at his resulting situation. But as observed in his words and demeanor, this does not represent true remorse for his criminal conduct. All combined, the Court does not believe that there is a likelihood of rehabilitation in confinement. Accordingly, the Court finds no mitigating value to this factor;

j) Catchall: The Court has received evidence that Defendant is a very bright and gifted person who expresses a desire to use his gifts to benefit others. The Court finds mitigating value to this factor;

k) The Court has further considered the possible applicability of the other statutory mitigating factors as

listed in N.C.G.S. § 15A-1340.16(e). The Court finds
that none of those additional factors apply.

Based upon the findings of fact and weighing the mitigating circumstances of

youth set forth in the *Miller*-fix statute, the sentencing court concluded that

defendant's crimes "reflect a condition of irreparable corruption and permanent

incorrigibility without the possibility of rehabilitation" and sentenced defendant to

two consecutive sentences of life without parole. Defendant appealed, and the Court

of Appeals determined that there was no error.

On appeal to this Court based upon a dissent, defendant argues that the Court

of Appeals "gave no meaningful appellate review to the trial court's sentencing

decision" because there was no showing that defendant was permanently incorrigible,

and defendant argues this purported error below allowed him to be sentenced to life

in prison without parole in violation of the Eighth Amendment to the federal

Constitution, Article I, Section 27 of our state constitution, and N.C.G.S. § 15A-

1340.19B. Specifically, defendant contends that the Court of Appeals did not conduct

"a full and fair appellate review" and employed the wrong standard of review. In

addition, defendant asserts that the sentencing court (1) failed to consider mitigating

evidence, (2) improperly considered defendant's criminal conduct, and (3) improperly

weighed evidence in mitigation.

We affirm the Court of Appeals.

## II.    Analysis

The Eighth Amendment to the federal constitution bars "cruel and unusual punishments." U.S. Const. amend. VIII. This Court recently held that Article I, Section 27 of our state constitution does not provide juveniles with the more robust sentencing protections the Supreme Court of the United States has developed in its Eighth Amendment jurisprudence. *State v. Tirado*, No. 267PA21 (N.C. Jan. 31, 2025). Instead, to ensure no citizen is afforded lesser rights, this Court continued its historical practice of lockstepping Article I, Section 27 with the protections of the Eighth Amendment. *Id.*, slip op. at 45. Thus, an analysis of sentencing for a juvenile murderer under the Eighth Amendment satisfies state constitutional scrutiny. *See id.*

In *Miller*, the Supreme Court "h[e]ld that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at 479. As this Court explains today, "*Miller* permits sentences of life without parole for juvenile murderers provided the sentencing court (1) considers a defendant's youth in mitigation, and (2) has discretion to impose a different punishment other than life without parole." *State v. Sims*, No. 297PA18 slip op. at 11 (N.C. Mar. 21, 2025); *Tirado*, slip op. at 44–45.

In *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the Supreme Court stated that *Miller* does not preclude juvenile murderers from being sentenced to life without parole, but it does prohibit such sentences "for all but the rarest of juvenile offenders . . . whose *crimes* reflect permanent incorrigibility." *Id.* at 209 (emphasis added). This

differentiates between "children whose *crimes* reflect transient immaturity" and those "whose *crimes* reflect irreparable corruption." *Id.* (emphasis added). The Court also concluded that "a finding of fact regarding a child's incorrigibility . . . is not required." *Id.* at 211.

To comply with the Eighth Amendment, a sentencing court simply must "follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a particular penalty. *Jones v. Mississippi*, 141 S. Ct. 1307, 1311 (2021) (quoting *Miller*, 567 U.S. at 483). According to *Jones*, it is the adherence to the sentencing procedure enunciated in *Miller* that provides the individualized consideration of a defendant's age and attendant circumstances of youth, combined with the nature of the crime, that "helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Id.* at 1318. Thus, it is the discretionary sentencing protocol itself that "help[s] make life-without-parole sentences relatively rare for murderers under 18." *Id.* (cleaned up). Important here, the Eighth Amendment does not require "an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility," but instead requires that the sentencing judge be afforded "discretion to consider the mitigating qualities of youth and impose a lesser punishment." *Id.* at 1314, 1319.

Our State legislature adopted N.C.G.S. §§ 15A-1340.19A to -1340.19D to address the requirements enunciated in *Miller*. The *Miller*-fix "gave trial courts the

discretion to determine whether juvenile murderers receive life without parole or the lesser sentence of life imprisonment with parole . . . . In making this determination, the trial court must consider certain enumerated mitigating factors along with any other mitigating factor or circumstance . . . ." *Tirado*, slip op. at 4 (cleaned up). This statutory scheme satisfies the Eighth Amendment as interpreted by *Miller* and does not presume in favor of either potential sentence. *Sims*, slip op. at 14; *see also State v. James*, 371 N.C. 77, 90, 813 S.E.2d 195, 205 (2018) (the statutory language "treats the sentencing decision required by N.C.G.S. § 15A-1340.19C(a) as a choice between two equally appropriate sentencing alternatives."). Thus, in following and applying the language of the *Miller*-fix statute, a sentencing court complies with the safeguards of the Eighth Amendment.

When a juvenile has been convicted of first-degree murder on the theory of premeditation and deliberation, the sentencing court must conduct a sentencing hearing pursuant to the *Miller*-fix statute. N.C.G.S. § 15A-1340.19B(a)(2) (2023). At this hearing,

> [t]he defendant or the defendant's counsel may submit mitigating circumstances to the court, including, but not limited to, the following factors:
>
> (1) Age at the time of the offense.
>
> (2) Immaturity.
>
> (3) Ability to appreciate the risks and consequences of the conduct.
>
> (4) Intellectual capacity.

-13-

(5) Prior record.

(6) Mental health.

(7) Familial or peer pressure exerted upon the defendant.

(8) Likelihood that the defendant would benefit from rehabilitation in confinement.

(9) Any other mitigating factor or circumstance.

N.C.G.S. § 15A-1340.19B(c) (2023).

A sentencing court is required to "consider any mitigating factors" presented, and its sentencing order "shall include findings on the absence or presence of any mitigating factors and such other findings as the court deems appropriate." N.C.G.S. § 15A-1340.19C(a) (2023). A "sentencing court complie[s] with *Miller* when it weigh[s] factors attendant to defendant's youth and, appreciating the discretion available, sentence[s] defendant." *Sims*, slip op. at 17. While a sentencing court must consider the factors listed in the *Miller*-fix statute, it is not required to weigh them in defendant's favor. Rather, it is the exercise of discretion by a sentencing court that "determine[s] whether, based upon all of the circumstances of the offense and the particular circumstances of the defendant, the defendant should be sentenced to life imprisonment with parole instead of life imprisonment without parole." N.C.G.S. § 15A-1340.19(C). A sentencing court is not required to apply an additional factor or filter to ensure rarity of the sentence. *Sims*, slip op. at 17-18.

Contrary to defendant's argument, the inquiry is not whether a defendant is permanently incorrigible or irreparably corrupt; nor is it potential for redemption. *See Jones*, 141 S. Ct. at 1322 ("*Miller* and *Montgomery* . . . [squarely rejected the argument] that the sentencer must make a finding of permanent incorrigibility . . . ."). The Supreme Court in *Miller* stated that life without parole should be reserved for the "rare juvenile offender whose *crime* reflects irreparable corruption." *Miller*, 567 U.S. at 479–80 (cleaned up) (emphasis added). *Montgomery* thereafter confirmed that *Miller* prohibited life without parole "for all but the rarest of juvenile offenders, those whose *crimes* reflect permanent incorrigibility." *Montgomery*, 577 U.S. at 209 (emphasis added). There is no separate requirement that a sentencing court make a finding the murderer is permanently incorrigible or irreparably corrupt.[4]

Under *Miller*, *Montgomery*, and *Jones*, the Eighth Amendment simply requires a sentencing court to consider youth and its attendant circumstances. *Sims*, slip op. at 19. Thus, the *Miller*-fix adheres to Eighth Amendment protections when sentencing juvenile murderers, as it is the sentencing court's exercise of discretion

---

[4] The Supreme Court in *Jones* explains why "an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility" is not required: it "(i) is not necessary to ensure that a sentencer considers a defendant's youth, (ii) is not required by or consistent with *Miller*, (iii) is not required by or consistent with this Court's analogous death penalty precedents, and (iv) is not dictated by any consistent historical or contemporary sentencing practice in the states." 141 S. Ct. at 1314, 1319.

when considering the nine factors in light of the nature of the crime which makes a sentence of life without parole relatively rare.

The Court of Appeals has properly stated that "[o]rders weighing the *Miller* factors and sentencing juveniles are reviewed for abuse of discretion." *State v. Golphin*, 292 N.C. App. 316, 322 (2024); s*ee also State v. Antone,* 240 N.C. App. 408, 410 (2015). Moreover, "[i]n non-capital cases we do not, and are not required to, conduct factual comparisons of different cases to determine whether a given sentence is constitutional." *State v. Ysaguire*, 309 N.C. 780, 786 n.3 (1983). Therefore, "[i]t is not the role of an appellate court to substitute its judgment for that of the sentencing judge." *State v. Lovette*, 233 N.C. App. 706, 721 (2014) (quoting *State v. Westall*, 116 N.C. App. 534, 551 (1994)).

Subsection 15A-1340.19C(a) requires the sentencing court to enter an order which "include[s] findings on the absence or presence of any mitigating factors and such other findings as the court deems appropriate." N.C.G.S. § 15A-1340.19C(a). Consistent therewith, however, a "trial court need not make a finding as to every fact which arises from the evidence; rather, the court need only find those facts which are material to the resolution of the dispute." *In re A.E.S.H.*, 380 N.C. 688, 693 (2022) (cleaned up). Moreover, our appellate courts will not reverse a discretionary sentence "merely because the sentencer could have said more about mitigating circumstances." *Jones*, 141 S. Ct. at 1321.

## A. Court of Appeals Opinion

Defendant contends that the Court of Appeals failed to conduct meaningful appellate review of the sentencing court's sentencing order, suggesting instead that the dissent provides a more appropriate review. However, defendant essentially argues that the majority erred when it declined to step into the shoes of the sentencing court and reweigh evidence. But it is not the job of appellate courts to reweigh evidence. *See Sims*, slip op. at 35. As we have noted:

> an important aspect of the trial court's role as finder of fact is assessing the demeanor and credibility of witnesses, often in light of inconsistencies or contradictory evidence. It is in part because the trial court is uniquely situated to make this credibility determination that appellate courts may not reweigh the underlying evidence presented at trial.

*Matter of A.A.M.*, 379 N.C. 167, 174 (citations omitted).

In its decision, the Court of Appeals majority squarely addressed defendant's Eighth Amendment argument, citing to and discussing Supreme Court case law concerning sentences of life without parole for juveniles, including *Miller*, *Montgomery*, and *Jones*. Based upon its analysis of these decisions, the majority below determined that the sentencing court's written order showed that it exercised discretion consistent with the Eighth Amendment in sentencing defendant.

In addition, the Court of Appeals addressed defendant's state constitutional argument under Article I, Section 27. There, the majority discussed the applicability of *State v. Kelliher*, 381 N.C. 558 (2022) and *State v. Conner*, 381 N.C. 643 (2022) related to the constitutional provision, along with the possibility that legal analysis supporting defendant's argument was "arguably *dicta*." *State v. Borlase*, 292 N.C.

-17-

App. 54, 63 (2024).   The majority also noted that even if *Kelliher* and *Conner* controlled, the sentencing court made findings consistent therewith.   *Id.*   We recently confirmed the Court of Appeals' analysis that *Kelliher* "is nonbinding obiter dictum." *Tirado*, slip op. at 44.[5]   Thus, because this Court locksteps Article I, Section 27 of our state constitution with the Eighth Amendment, *id.* at 45, defendant's argument that the courts below allowed him to be sentenced in violation of our state constitution is without merit.

Moreover, the majority below specifically addressed defendant's argument concerning N.C.G.S. § 15A-1340.19B and the *Miller* factors set forth therein.   In fact, the discussion below correctly stated that the statute does not require a finding of permanent incorrigibility before specifically addressing the five *Miller* factors challenged by defendant.   *Borlase,* 292 N.C. App. at 59–62.

The dissent in the Court of Appeals suggests, and defendant argues, that the sentencing court violated defendant's constitutional rights under the Eighth Amendment pursuant to *Eddings v. Oklahoma*, 455 U.S. 104, 104 (1982) by "refusing to consider, as a matter of law, the relevant mitigating evidence regarding defendant's family life and immaturity."   *Id.*, at 80 (Arrowood, J., dissenting) (cleaned up).   Specifically, defendant contends he presented uncontradicted evidence concerning his youth, family pressures, and immaturity, and the sentencing court

---

[5]While the Court of Appeals appropriately confronted *Kelliher*, even if not dicta, *Kelliher's* precedential value is questionable.   *See id.* at 49 (Berger, J., concurring) ("*Kelliher* is an outlier that is entitled to little precedential weight." (cleaned up)).

failed to make necessary findings that his age was a mitigating factor, improperly considered familial pressures, and ignored credible expert testimony regarding his psychological state.

But defendant misapprehends the inquiry as *Jones* has clarified that courts must consider mitigating evidence, not make explicit findings or assign weight. *Jones*, 141 S. Ct. at 1316 (there is no requirement that a "sentencer . . . make any particular factual finding regarding those mitigating circumstances."). While a defendant may have an "Eighth Amendment claim if the sentencer expressly refuses *as a matter of law* to consider relevant mitigating circumstances," *id.* at 1320 n.7,[6] "*Eddings* . . . permits a sentencer to find mitigating evidence unpersuasive," *Thornell v. Jones*, 144 S. Ct. 1302, 1305 (2024). In other words, there may be an Eighth Amendment violation only if a sentencing court expressly refuses to consider relevant mitigating circumstances.

But contrary to the argument presented by defendant and the dissent below, the sentencing court here did not refuse to consider relevant mitigating evidence. In fact, the sentencing court expressly considered each of the mitigating factors as set forth above, including familial pressure and immaturity; it simply found the evidence relating to these factors unpersuasive. Regarding immaturity, the court acknowledged studies that show slower brain development in juveniles, but found

---

[6] *Jones* explains the difference between "expressly refus[ing] as a matter of law to consider" mitigating factors such as "the defendant's youth," as opposed to "deeming the defendant's youth to be outweighed by other factors." *Jones*, 141 S. Ct. at 1320 n.7.

that "there is no credible, specific evidence before the Court that Defendant suffered from any specific immaturity that would act to mitigate his decisions and conduct in this case." Concerning defendant's familial pressures, the sentencing court found that while "[d]efendant may have disagreed with the form of discipline" by his parents, he benefitted from "very loving, caring and nurturing parents."

Although the sentencing court could have recounted additional evidence from the sentencing hearing in its order, there is no requirement that a sentencing court recount all of the testimony and evidence presented. *See Sims*, slip op. at 20 (quoting *Jones*, 141 S. Ct. at 1321) ("appellate courts will not reverse a discretionary sentence 'merely because the sentencer could have said more about mitigating circumstances.'") Moreover, although defendant disagrees with the weighing of these factors by the sentencing court, it is not the role of appellate courts to reweigh the evidence. *Sims*, slip op. at 23 ("[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing judge." (citation omitted)).

Thus, defendant's argument that the Court of Appeals failed to conduct a thorough and proper appellate review is without merit.

## B. Proper Standard

Defendant next contends that the Court of Appeals failed to employ an abuse of discretion standard, even though he acknowledges that the majority determined the sentencing court's sentencing decision "was not arbitrary." Defendant goes on to state that "[t]he governing legal standard in *Miller* cases is that [life without parole]

is reserved 'for those juvenile defendants whose crimes reflect irreparable corruption rather than transient immaturity.' "

Sentencing courts consider the *Miller* factors "based upon all the circumstances of the offense and the particular circumstances of the defendant." N.C.G.S. § 15A-1340.19C(a). Sentences imposed after conducting a *Miller*-fix hearing "are reviewed for abuse of discretion." *Golphin*, 292 N.C. App. at 322; *see also Antone*, 240 N.C. App. at 410. A sentencing court abuses its discretion when a "ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Golphin*, 292 N.C. App. at 322 (cleaned up). *See Sims*, slip op. at 23-24 (explaining that the sentencing court acknowledged the defendant's immaturity as a mitigating circumstance, but found that in light of other evidence presented, it was of minimal significance, and the defendant could not demonstrate that the sentencing court abused its discretion).

The sentencing court here provided a thorough analysis, considering each of the relevant mitigating factors, and defendant's argument is without merit.

## C. Sentencing Court

Defendant makes three arguments concerning the sentencing court's consideration of and weighing of mitigating evidence: (1) the court failed to consider mitigating evidence; (2) the court improperly considered defendant's criminal conduct; and (3) the court improperly weighed evidence in mitigation.

But the sentencing court considered defendant's mitigating evidence and made explicit findings in its written order. There is no evidence in the record or in the order to suggest that the sentencing court expressly refused to consider relevant mitigating evidence. In the absence of express evidence that demonstrates a sentencing court did not consider mitigating evidence or exercise its discretion, we will not presume error. *See State v. Vann*, 386 N.C. 244, 253–54 (2024) ("[I]it is presumed that a trial court acted correctly until statements of the trial court show that the trial court did not exercise discretion. . . . This presumption dictates that appellate courts should presume that the trial judge did not commit error absent affirmative evidence to the contrary." (cleaned up)); *see also Matter of A.P.W.*, 378 N.C. 405, 411 (2021) ("[W]e presume the findings made by the trial court are supported by competent evidence. . . . [I]t is the responsibility of the [defendant] . . . to show error, otherwise the Court cannot presume error." (cleaned up)); *In re A.R.H.B.*, 186 N.C. App. 211, 219 (2007) ("The longstanding rule is that there is a presumption in favor of regularity and correctness in proceedings in the trial court, with the burden on the [defendant] to show error." (citation and quotation marks omitted)).

As to defendant's specific arguments, first, the sentencing court plainly considered defendant's age in mitigation. The sentencing judge stated, "Defendant was 17 years and 11 months old on the offense date. He reached the age of adulthood only one month after committing these homicides[.]" As explained in *Jones*, the defendant's argument that "an on-the-record sentencing explanation [is] . . .

necessary to ensure that a sentencer considers a defendant's youth" is without merit, as the sentencer will necessarily consider the defendant's youth when exercising its discretion under *Miller*. *Jones* at 1319-1320 ("[T]he key point remains that, in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor."). Put another way, when a sentencing court conducts a sentencing hearing and exercises discretion consistent with our *Miller*-fix statute, the sentencing court has necessarily considered a defendant's age and the attendant circumstances of youth.

While defendant takes issue with the fact that the sentencing court did not expressly state in its order that defendant's age was a mitigating factor, it is clear the sentencing court considered defendant's age along with other relevant evidence. Although defendant contends the sentencing court's finding concerning this *Miller*-fix factor is deficient, our appellate courts will not reverse a discretionary sentence "merely because the sentencer could have said more about mitigating circumstances." *Id.* at 1321. Moreover, because there is no affirmative evidence in the record that the sentencing court refused to consider defendant's age in mitigation, defendant has not demonstrated error. Thus, this Court applies the longstanding presumption of regularity, and defendant's argument is without merit.

Next, the sentencing court did not err in its assignment of mitigating value to either the familial pressure or immaturity factors. Here again, defendant has not demonstrated that the sentencing court refused as a matter of law to consider the

evidence he put before them. Rather, defendant simply contends that the sentencing court did not weigh the mitigating evidence in his favor. But "the weight assigned to any particular mitigating circumstance is solely the province of the sentencer." *Sims*, slip op. at 21 n.3.

Concerning the familial factor, the sentencing court found that defendant had "benefited from . . . parents who deeply loved him and all his siblings and who sacrificed beyond even reasonable measure to provide for their children's health, welfare, happiness, needs and even wishes." Defendant even reported to Dr. James Hilkey, the forensic psychologist, that he believed his parents had the best intentions for him with their strict parenting. While there was evidence before the sentencing court that defendant lived in an overbearing household in which his mother applied questionable discipline, there was sufficient evidence to support the sentencing court's findings, and we will not substitute our judgment for that of the sentencing court. *See Lovette*, 233 N.C. App. at 721. Thus, defendant's contention is without merit "[b]ecause the weight afforded to a mitigating circumstance is within the sound discretion of the sentencing court." *Sims*, slip op. at 23.

The sentencing court also did not err in its finding on the immaturity factor. Dr. Hilkey's report provided general evidence related to brain development in adolescents that was not specific to defendant. In fact, according to Dr. Hilkey, defendant exhibited reasoning abilities at a level significantly above that of his peers. The sentencing court considered the evidence presented on this *Miller* factor and

determined that, in the absence of "any specific immaturity that would act to mitigate [defendant's] decisions and conduct," defendant's purported immaturity was not a significant mitigating factor. Once again, while the sentencing court could certainly have made a different finding on this factor and weighed it differently, the record supports the sentencing court's findings, and the weight to be assigned to the evidence is in the sentencing court's sole discretion. *Sims*, slip op. at 31 ("[T]he weight afforded to a mitigating factor lies within the sound discretion of the sentencing court.").

Finally, the sentencing court determined that defendant exhibited the cognitive capacity to appreciate the risks of his actions. Defendant's role in planning and carrying out the murders, his attempts to conceal or destroy evidence thereafter, and his attempt to flee the state are also indicative of his ability to understand and appreciate the risks associated with his conduct. *See Sims*, slip op. at 24 (concluding that the defendant's efforts to dispose of evidence and conceal his participation in the crime indicates an appreciation of the risks associated with his conduct); *State v. Roberts*, 876 N.W.2d 863, 869 (Minn. 2016) (holding that the defendant "indicated an awareness of the consequences of his behavior when," among other things, he "dispos[ed] of evidence"); *Cook v. State*, 242 So. 3d 865, 875 (Miss. Ct. App. 2017) ("[Defendants'] efforts to cover their tracks suggested an awareness of the consequences.").

The actions taken by defendant were deliberate decisions made by an individual one month shy of his eighteenth birthday who understood the consequences of his decisions, and we will not substitute our judgment for that of the sentencing court. *See Lovette*, 233 N.C. App. at 721; *see also Sims*, slip op. at 34.

## III.   Conclusion

The Court of Appeals conducted an appropriate review of the sentencing court's order in light of relevant federal and state requirements when it concluded that defendant's sentence was constitutionally sufficient under *Miller*. In adhering to the procedure set forth in our *Miller*-fix statute, balancing the *Miller* factors in light of the crimes committed by defendant, and exercising its discretion in sentencing defendant to consecutive sentences of life without parole, the sentencing court did not abuse its discretion, and we affirm the judgment of the Court of Appeals.

AFFIRMED.

Justice EARLS and Justice RIGGS dissenting.

A jury found that on 10 April 2019, at age seventeen, Tristan Borlase murdered both of his parents, Tanya and Jeff Borlase, just months before he was set to graduate from high school. Tristan's violent murders were reprehensible, and his disorganized attempts to cover up the crimes only caused further trauma by creating a situation where his sibling discovered their father's body at the family's home. After Tristan was convicted, the sentencing judge was presented with a question of the appropriate sentence: two counts of life without the possibility of parole or two counts of life with the possibility of parole—a minimum term of twenty-five years for each count. The sentencing court heard victim impact statements from the surviving family members and evidence from Tristan's teachers, church group leader, and psychological examiner about his background, maturity, family relationships, and mental health. The court concluded that there was no credible evidence of familial pressure or immaturity that might have mitigating value in its sentencing decision.

The majority takes that conclusion at face value. In doing so, it signals to sentencing courts that they have a blank check when using their discretion to sentence a juvenile to die in prison for an intentional murder they committed as a minor.

We do not endorse that proposition, which is incompatible with federal constitutional precedent and our state laws. The Constitution is not crime specific. It

applies to all who stand accused of a criminal offense. The crimes here are heinous, as the majority details. Yet that fact does not dissolve Tristan's constitutional and statutory protections. And it does not excuse this Court from faithfully invoking those safeguards. We dissent and would reverse the judgment of the Court of Appeals and remand this matter for further remand to the trial court for a new sentencing hearing.

## I.   Analysis

### A. Issues Presented

This appeal comes to us based on the narrow scope of the dissent below. *See* N.C.G.S. § 7A-30(2) (2023) (repealed 2023). Accordingly, the issues before us are limited to those that are "specifically set out in the dissenting opinion as the basis for that dissent" and argued by the parties on appeal. *Cryan v. Nat'l Council of YMCAs*, 384 N.C. 569, 574 (2023). The first issue is whether the Court of Appeals applied the appropriate standard of review to the underlying *Miller* sentencing order. *See State v. Borlase*, 292 N.C. App. 54, 73–74 (2024) (Arrowood, J., dissenting). The second issue is whether the Court of Appeals correctly concluded that the trial court properly applied N.C.G.S. §§ 15A-1340.19B and -1340.19C and the Eighth Amendment to the evidence presented during the sentencing hearing. *See id.* at 73–80.

We agree with the Court of Appeals dissent that the majority below erred on both fronts. First, it applied the wrong standard of review, a mistake which the Court compounds by affording sentencing courts carte blanche authority reviewed only for abuse of discretion. Second, it wrongfully upheld the trial court's sentencing order.

The sentencing order failed to credit manifestly credible, uncontradicted evidence probative of the familial pressure statutory factor. Further, the trial court's definition of familial pressure represents an outdated and crabbed view of the factor.

We stress the questions presented because the majority entirely ignores our jurisdictional precedent and overreaches to issues and arguments not before us. Specifically, the dissenting judge below did not invoke any heightened protections for criminal defendants under Article I, Section 27 of our state Constitution as any basis for his dissent. The opposite is true. The dissenting judge expressly indicated that he interpreted the Eighth Amendment analysis as the same as the state constitutional analysis for the purposes of his narrow constitutional point—that a trial court's refusal to consider manifestly credible evidence at sentencing is constitutional error in addition to statutory error. *See id.* at 64, 64 n.1. Thus, the majority's invocation of its dicta in *State v. Tirado*, No. 267PA21 (N.C. Jan. 31, 2025), is, yet again, beside the point and properly disregarded as dicta. *See* majority *supra*, Part II; *accord Tirado*, slip op. at 50 (Earls, J., concurring in the result only) (noting that the majority's "gratuitous and sweeping commentary on Section 27 and its overlap with the Eighth Amendment . . . is pure dicta").[1]

---

[1] This Court's binding precedent in *State v. Kelliher*, 381 N.C. 558 (2022), is likewise not implicated because the sentencing court here expressly determined that it believed Tristan Borlase was one of those rare juveniles who is irredeemable. *See id.* at 560 ("[I]t violates both the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution to sentence a juvenile homicide offender who has been determined to be 'neither incorrigible nor irredeemable' to life without parole.").

## B. Standard of Review of *Miller* Sentencing Orders

The dissent below concluded and Tristan argued before us that the Court of Appeals applied the wrong standard of review to the sentencing court's order based on our precedent and that of the United States Supreme Court. We agree.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the United States Supreme Court announced a substantive rule of the Eighth Amendment: "sentencing juveniles [to life without parole] will be uncommon" because such a sentence requires a determination that a young person—who is characteristically immature, impulsive, and reckless due to their stage of life—is "the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 479–80 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)). A sentencing court given the opportunity to consider characteristics of a juvenile defendant and his background, upbringing, and mental and emotional development, as well as the "circumstances of the homicide offense," *id.* at 477, will necessarily have to consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," *id.* at 480.

*Montgomery v. Louisiana*, 577 U.S. 190 (2016), confirmed this substantive holding. *Id.* at 201. The Court clarified that "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" *Id.* at 208 (quoting *Miller*, 567 U.S. at 479). Plainly, affording a sentencer discretion to consider age is not enough for the Eighth Amendment.

Imposing a discretionary sentence that is disproportionate in light of the concerns identified in *Miller* is unconstitutional. *Id. Montgomery* clarified that *Miller* "did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at 209.

In *Jones v. Mississippi*, 141 S. Ct. 1307 (2021), the Court reaffirmed that *Miller* and *Montgomery* remain good law. *Id.* at 1321. It addressed a narrower procedural question: whether to recognize "an *additional* constitutional requirement" that a sentencer must make a specific finding of permanent incorrigibility before awarding a juvenile a sentence of life without parole. *Id.* at 1322 (emphasis added). It declined to do so, noting the variation in practices among the fifty states as to the procedures for reviewing a sentencing court's determinations. *Id.* Thus, under *Jones v. Mississippi*, the operative standard for the specifically required findings and process of review to implement *Miller*'s mandate is state-specific.

We turn, then, to what North Carolina law compels about specific findings in a *Miller* sentencing order and how they should be reviewed. In an almost-immediate response to *Miller*, our General Assembly enacted N.C.G.S. § 15A-1340.19A providing that "a defendant who is convicted of first degree murder, and who was under the age of 18 at the time of the offense, shall be sentenced in accordance with this Part." N.C.G.S. § 15A-1340.19A (2023). This statutory scheme provides for a "penalty determination" hearing with set procedures. N.C.G.S. § 15A-1340.19B (2023). Counsel for the defense may submit evidence of "mitigating circumstances" for the

court's consideration and is entitled to receive the last argument. N.C.G.S. § 15A-1340.19B(c), (d). We observed in *State v. James*, 371 N.C. 77 (2018), that these statutes are designed to bring state sentencing laws into compliance with *Miller*, and specifically its requirement that a juvenile sentence of life without parole "should be reserved for 'the rare juvenile offender whose crime reflects irreparable corruption.' " *Id.* at 92 (quoting *Miller*, 567 U.S. at 479–80). But parts of the statute even go beyond Eighth Amendment jurisprudence to meet this substantive goal. For example, the statutes forbid the imposition of life without parole for a defendant convicted on a felony murder homicide theory, which is an additional protection on top of the Supreme Court's current constitutional rule limiting juvenile sentences of life without parole to homicide offenses only. *See* N.C.G.S. § 15A-1340.19B(a); *Graham v. Florida*, 560 U.S. 48, 80 (2010) (forbidding juvenile sentences of life without parole for nonhomicide offenses).

To understand what standard of review applies to this statutory sentencing procedure, our precedent on the Fair Sentencing Act controls. In *State v. Spears*, 314 N.C. 319 (1985), we clarified that the standard of appellate review of a sentencing order depends on whether the challenged factors are statutory, meaning they are expressly identified in the statute, or non-statutory, meaning they are not so identified. *Id.* at 322–23. Statutory factors impose a heavier burden on the sentencer. Evidence of such factors *must* be considered, even if they are not disputed by the parties. *Id.* at 322. Thus, a court's consideration of statutory factors is reviewed more

rigorously: "[F]ailure to find a *statutory* mitigating factor supported by uncontradicted, substantial and manifestly credible evidence is reversible error." *Id.* at 322. This more rigorous review standard was necessary to give proper effect to the Fair Sentencing Act. That Act sought to make criminal punishment commensurate with the nature of the offense and the offender's culpability. *State v. Jones*, 309 N.C. 214, 219 (1983). After all, if evidence of a given mitigating factor is "uncontradicted, substantial, and there is no reason to doubt its credibility, to permit the sentencing judge simply to ignore it would eviscerate" that Act and violate the legislature's intent. *Id.* at 218–19.

Here, the *Miller* sentencing statute plainly requires courts to consider statutory factors with the substantive goal of making juvenile life without parole sentences "uncommon" and "reserved for 'the rare juvenile offender whose crime reflects irreparable corruption.' " *James*, 371 N.C. at 92 (quoting *Miller*, 567 U.S. at 479–80). The statute specifically names eight such factors: the juvenile defendant's age at the time of the offense, their immaturity, their ability to appreciate the risks and consequences of their conduct, their intellectual capacity, their prior record, their mental health, any familial or peer pressure exerted upon them, and any likelihood that they would benefit from rehabilitation while incarcerated. N.C.G.S. § 15A-1340.19B(c)(1)–(8). These factors track *Miller*'s description of mitigating evidence in sentencing a juvenile to life without parole. *See Miller*, 567 U.S. at 477–78. And they are statutory factors that trigger more rigorous appellate review. *See Spears*, 314

N.C. at 322. Underscoring that point, the statutes further instruct that the court *must* consider any evidence of such factors and *must* make findings on their presence or absence in light of the "particular circumstances of the defendant." N.C.G.S. § 15A-1340.19C(a) (2023).

The sentencer's mandatory obligation to consider probative mitigating evidence is why we concluded in *James* that the statutory scheme facially complies with the Eighth Amendment. *See* 371 N.C. at 90 ("[A] number of factors, including, but not limited to, the statutorily enumerated mitigating factors, must be considered in making the required sentencing determination . . . ."). *James* made clear that to sentence a juvenile to life imprisonment without the possibility of parole, the court must make findings on the enumerated statutory factors. *Id.* at 89–90. Such findings, we noted, will guide a sentencing court to assess evidence that might mitigate a juvenile's punishment in light of *Miller*'s "substantive standard": that a juvenile is irredeemable in light of all the facts and circumstances. *Id.* at 90. Just like we said in *Jones* about the Fair Sentencing Act, affording abuse of discretion review only to the sentencing court's consideration of those mandatory statutory factors would eviscerate the purpose of the *Miller* constitutional sentencing standard and the legislature's intent in enacting a statutory scheme in compliance with that standard.

Thus, under the statutes designed to implement *Miller*'s mandate as well as our precedent, review for a *Miller* sentencing order has two steps. First, a reviewing court looks to whether the sentencing court properly considered the evidence

applicable to each statutory factor based on an accurate understanding of the legal standard. At this step, reversible error occurs where a sentencing judge "fails to find a statutory factor when evidence of its existence is both uncontradicted and manifestly credible." *Jones*, 309 N.C. at 220; *accord Spears*, 314 N.C. 319. Provided that the mitigating factors were accurately tallied, a reviewing court moves to step two: we assess the sentencing court's ultimate decision as to how to weigh the mitigating factors for abuse of discretion. *E.g.*, *State v. Canty*, 321 N.C. 520, 527 (1988). Accordingly, when a defendant who is sentenced at a *Miller* hearing charges that the sentencing court failed to credit manifestly credible and uncontradicted evidence of one or more of the sentencing factors, a reviewing court must reverse if "the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn." *Jones*, 309 N.C. at 219–20 (quoting *N.C. Nat'l Bank v. Burnette*, 297 N.C. 524, 536–37 (1979)).

The majority's standard of review is hardly a standard at all. Even though the statutes require specific findings on specific mitigating factors, the majority bundles together the entirety of the sentencing order for abuse of discretion review. *See* majority *supra* Section II.B. Notwithstanding *Miller*'s substantive holding, reaffirmed by *Montgomery* and *Jones*, and interpreted by this Court in *James* and *Kelliher*, the majority concludes blithely that "[a] sentence of life without the possibility of parole for juveniles is allowed," *State v. Sims*, No. 297PA18 (N.C. Mar. 21, 2025), slip op. 35, and will not be reversed "merely because the sentencer could

have said more about mitigating circumstances,' " *see* majority *supra* Part II (quoting *Jones v. Mississippi*, 141 S. Ct. at 1321). As to a challenge that the sentencer failed to consider a defendant's mitigating evidence, the majority will not find error absent "express evidence that demonstrates a trial court did not consider mitigating evidence or exercise its discretion." Majority *supra* Section II.C. This exceedingly deferential standard has no support in federal constitutional law or North Carolina precedent. It amounts to no real standard of review whatsoever beyond one which provides that "we reverse only if the trial judge explicitly says he is refusing to follow the law." An appellate court has the responsibility to do more.

To start, *Jones v. Mississippi* does not authorize giving carte blanche authority to a *Miller* sentencing court, reviewed only for an abuse of discretion. Again, that case decided only a narrow procedural issue: whether a specific finding of fact is required as a prerequisite to sentencing a juvenile to life without the possibility of parole. *Jones*, 141 S. Ct. at 1312–13. The Court said no, instead deferring to existing state court practices for reviewing sentencing orders. *Id.* at 1321. It recognized that many states have different requirements regarding the on-the-record explanations by sentencers and that appellate courts take different approaches as to what state law requires of reasons supplied by sentencing judges. *Id.* This sensitivity to federalism did not overrule *Miller*'s substantive constitutional rule—as *Jones* expressly and repeatedly confirmed. *Id.* ("Today's decision does not overrule *Miller* or *Montgomery*.").

The majority invokes *Jones*'s observation that reversal is not warranted "merely because the sentencer could have said more." *Id.* But that observation was itself a recitation of California's sentencing practices and those of other states. *See id.* (first citing Arthur W. Campbell, *Law of Sentencing* § 10:5, at 477 (3d ed. 2004) (reviewing in footnote 107 requirements of sentencing judges in Indiana, North Dakota, California, and Iowa); and then citing 22A Cal. Jur. 3d, *Crim. Law: Posttrial Proceedings* § 408, at 234 (2017) (California's legal encyclopedia on its posttrial proceedings)). Needless to say, North Carolina is not California. Our Court is bound by our precedent, not that of other states.[2]

This misleading quotation of *Jones* obscures the majority's real maneuver here: to ignore North Carolina precedent while charting a new approach without explaining why. Simply put, North Carolina precedent does not support blanket abuse of discretion review. In *State v. Sims*, also announced today, the majority tries to justify its new standard of review by presenting it as extending from our precedent on the Fair Sentencing Act. Slip op. at 21 n.3. But there and here, the majority ignores our long-standing distinction between statutory and non-statutory factors for the

---

[2] The majority of our Court is not alone in ignoring binding North Carolina precedent in favor of practices in other states. Curiously, the Court of Appeals majority below pulled its "abuse of discretion" standard of review from Mississippi law—and likewise wholly ignored binding precedent from our Court. *State v. Borlase*, 292 N.C. App. 54, 59 (2024) ("[The Mississippi sentencing judge] recognized the correct legal standard ('the *Miller* factors'), his decision was not arbitrary, and his findings of fact [were] supported by substantial evidence." (second alteration in original) (quoting *Jones v. State*, 285 So. 3d 626, 632–33 (Miss. Ct. App. 2017), *aff'd sub nom. Jones v. Mississippi*, 141 S. Ct. 1307 (2021))). This is yet further grounds to reverse the judgment of the Court of Appeals.

purposes of appellate review.[3] Instead it abandons this precedent and chooses an even more toothless standard than that argued for by the State in this case. It offers no credible explanation for why statutory factors receive more rigorous review in those cases but not here—particularly when the statutes share goals of making certain factors mitigating as a matter of law and are designed to ensure that punishments are commensurate to the nature of the offense and the offender's culpability.[4] The majority's reasoning, that an appellate court can trust that the sentencing court considered characteristics of the juvenile because they had discretion to so consider those characteristics, is circular.

---

[3] Indeed the very cases the majority cites in its *Sims* footnote do not stand for the principle it now asserts. *E.g.*, *State v. Canty*, 321 N.C. 520, 524 (1988) ("To show that the trial court erred in failing to find a mitigating factor, the evidence must show conclusively that this mitigating factor exists, i.e., no other reasonable inferences can be drawn from the evidence."); *State v. Ahearn*, 307 N.C. 584, 597 (1983) (noting that "the court is required to consider all statutory factors to some degree" even as it may properly emphasize some more than others and observing that the presumption of validity applies "[s]hould the Appellate Court find no error in the trial court's findings" of aggravating or mitigating circumstances (quoting *State v. Davis*, 58 N.C. App. 330, 333–34 (1982))); *State v. Jaynes*, 342 N.C. 249, 285 (1995) ("The General Assembly has determined as a matter of law that statutory mitigating circumstances have mitigating value. Therefore, jurors must give them some weight in mitigation. Nevertheless, the amount of weight any particular statutory mitigating circumstance is to be given is a decision entirely for the jury." (citations omitted)).

[4] Oddly, too, the majority reaches for precedent from an entirely separate area of law: our civil cases reviewing dispositional orders in juvenile cases. But any presumption of regularity in those cases clearly does not apply here, where sentencing courts are required to make express findings on mitigating statutory factors to enforce a criminal law constitutional mandate. Our juvenile cases even recognize a similar distinction between legal error and a discretionary choice. We review more rigorously whether a trial court's findings of fact have adequate support and whether those factual findings adequately support the trial court's legal conclusions. The trial court's ultimate dispositional choice in light of those conclusions receives a more deferential review. *See In re A.P.W.*, 378 N.C. 405, 410 (2021). Again, the majority's invocations of precedent do not support its assertions. Instead the majority collapses well-worn nuances in appellate review to afford even more discretion to trial courts than is tolerated in other areas of law.

The effect of the majority's test is to abandon our precedent without explanation and gut meaningful appellate review of substantive constitutional protections in the process. It leaves defendants with less protection than the legislature intended and the Constitution guarantees.

## C. Specific Challenges to the Sentencing Order

On appeal, Tristan asks this Court to hold that the trial court failed to find three mitigating factors in light of supportive evidence that was uncontradicted, substantial, and manifestly credible. We find no legal error in the trial court's analysis of the mitigating circumstances of age and immaturity. However, the trial court erred by failing to credit manifestly credible and uncontradicted evidence for the "familial or peer pressure" statutory factor. *See* N.C.G.S. § 15A-1340.19B(c)(7). In particular, the trial court viewed too narrowly what kinds of events or patterns in childhood might create familial pressure, leading a troubled, but not hopelessly irredeemable, adolescent to act out on violent urges or fantasies.

### 1. *Evidence Presented*

Any consideration of familial pressure in a case where a then-juvenile was convicted of intentionally killing both of his parents is inevitably fraught. No one would suggest that anything Jeff or Tanya Borlase did as parents or people would justify their intentional murders. Yet a sentencing court must be clear that a mitigating circumstance is not a justifying one. Even in such a heinous crime, *Miller* requires that a sentencer consider "the family and home environment" that

surrounded the offender. *Miller*, 567 U.S. at 477. Such background circumstances are relevant because the home environment is one "from which [a juvenile] cannot usually extricate himself—no matter how brutal or dysfunctional." *Id.* That lack of agency over a juvenile's home environment and the extreme pressure such an environment can create are hallmarks of juvenility. They are therefore essential to the assessment of whether a defendant is the "rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 479–80 (quoting *Roper*, 543 U.S. at 573).

The record shows that Jeff and Tanya Borlase had four biological children (Taylor, Alexis, Kaia, and Tristan) and four adopted children (Meseret, Melaku, Stephen, and Eli). Tristan was the youngest of the biological children. The family experienced instability in the years leading up to Tristan's crimes. Two of the adopted children exhibited anger issues related to their traumatic backgrounds and occasionally acted out physically. Simmering intrafamily conflicts contributed to a slow breakup of the family unit. In 2016, Jeff and Tanya sent Meseret to therapeutic foster care in Missouri.[5] In 2017, partly because the adopted brothers did not get along, Jeff and Tristan continued living with Melaku in Mooresville while the rest of the family moved to Deep Gap. In spring of 2018, Tristan's teacher reported to the school administration that she understood Tristan's mother could not be around his

---

[5] Meseret described an incident where her parents caught her video calling with a friend, against household rules, and then they proceeded to drive her to a psychiatric hospital in the middle of the night. She explained that she never went home again and was subsequently placed in foster care.

violent younger brother and that this put stress on Tristan. After the end of the spring school term in 2018 and prior to Tristan's senior year of high school, Jeff and Tristan moved to Deep Gap and Melaku was sent to a boarding school for academic and behavioral issues until he was later emancipated by Meseret. Tanya, Jeff, Stephen, Eli, and Tristan were the only Borlase family members living in Deep Gap during spring of 2019.

The home environment in Deep Gap presented other challenges. Tristan's English teacher reported to the school counselor that the home was unfit to live in due to lack of electricity and upgrades. It was apparently a two-story shed the family was converting into a home. Before the move, Tristan and his father and brother were driving every weekend from Mooresville to Deep Gap to work on the cabin, according to a church group leader. Tristan testified that he once helped his mother tear out the inside of the home before an inspection to prevent inspectors from knowing that the family was living there in the condition it was in and out of fear that the family would lose the Deep Gap property. He testified that occasionally he slept in the goat pen or his car because it was warmer than the house.

Uncontradicted evidence demonstrated that Jeff and Tanya parented their children through unusual and harsh forms of discipline. Tristan described being woken up in the middle of the night by his mother sometimes as many as "four out of five school nights" for disciplinary conversations about Tristan's grades, his relationships with girls, and religion. Evidence from his teachers corroborated that

Tristan appeared physically fatigued in class, was frequently late to class, and appeared unmotivated. The adoptive children confirmed experiencing these punitive midnight lectures, which they called being summoned "to the nest." A church group leader shared that in 2017, Tristan was sent to a week-long church retreat with only one shirt and one pair of shorts as a form of punishment. The leader had to purchase extra clothes for him. The church group leader shared her concerns about Tristan and the family with the youth leaders, who then allegedly spoke with the family, after which "Tristan cut off his involvement" with the program. A former girlfriend of Tristan's shared that she could occasionally hear Tristan's mom screaming at him while he was on the phone. The church group leader described that she frequently witnessed Tanya "incessantly" calling Tristan for updates on his whereabouts. Tristan's classmate saw bruises on his torso at least once and when she asked him about it, he said the bruises were from his parents hitting him. Tristan's sister Taylor described an "ongoing struggle for years" between Tristan and their parents.

Tristan's mental health appeared to worsen as he approached high school graduation. In 2017, his church group leader had advocated for placing Tristan in a temporary mental health hold to watch his behavior after observing him, concerned that he posed a risk of harm to himself. Tristan testified that in 2018 he contemplated and attempted suicide. That same year, he was participating in outpatient counseling due to impulse control and poor judgment in school and told his mother that he did

not share her religious beliefs, causing further family strife.[6] The forensic psychiatrist who examined him found scars from self-mutilation that would have preceded his 2019 arrest. That medical professional found that Tristan had a strong desire to please others and felt internal conflict because he could not please Tanya or meet her expectations. Tristan's English teacher testified that the semester had started normally in January 2019, but that Tristan's performance declined as he failed to turn in assignments and he struggled to stay awake in class.

On 10 April 2019, the day Tristan killed Tanya and Jeff, Tristan's English teacher called Tanya to share her concerns that he was failing to turn in assignments, falling asleep in class, and risked failing her course. His parents checked Tristan out early from school. Tristan testified that the family discussed his shortcomings, like his tardiness and likelihood of not graduating from high school. Notes in Tanya's handwriting supported that the two had a disciplinary discussion about Tristan's behavior. Surveillance cameras that Tristan had helped to install showed that later, at 6:32 p.m., Tristan went outside toward the driveway where Jeff was working, before going back inside the home. Tristan testified that Tanya told him he needed to e-mail his teachers about his class performance. He testified that while he was typing an e-mail she dictated, the two started arguing about religion, at which point Tristan

---

[6] We mention these details about the differences in religious views not to imply that familial pressure always results in families with strongly held religious views, but rather to convey that in this family, divergent religious views appeared to be a source of family tension and conflict.

said, "F--k you, that's not what Christianity is about." He testified that Tanya put her arm around his neck and applied pressure, and that he reacted by elbowing her, after which she approached him with a pair of scissors, and he grabbed a kitchen knife and stabbed her. Her autopsy showed she had been "asphyxiated by some type of pressure to the neck" before her death.

By 6:35 p.m., the surveillance camera showed that Tristan ran toward his father in the driveway with a knife and stabbed him. Jeff then ran away from Tristan, but Tristan caught up and started attacking his father with the knife. Jeff Borlase died from multiple stab wounds to his torso. Tristan testified that he then returned to the house and vomited in the toilet before proceeding to hose down the front porch, move his mother's body to the back of a truck, and drive the truck closer to the barn. At some point he covered his father's body with a hammock and leaves.

Tristan testified that he then showered, packed his clothes, and left to pick his younger brother up from their grandmother's house. He and his brother then returned home, where when his brother asked about the blood around the house, Tristan lied about cutting himself while doing dishes. Tristan then left to go smoke with his friends before trying to pick up his other brother from work. He testified that he then drove back to the house, but upon seeing cars in the driveway, left and went to a friend's house to stay the night after telling her he had gotten into an argument with his parents. The next morning the two headed to the friend's father's house in Tenneessee but were apprehended as soon as they crossed the state border. Tristan

confessed to the police and later claimed self-defense during trial. The jury ultimately found him guilty of two counts of first-degree murder.

### 2. *Consideration of Familial Pressure in the Sentencing Order*

At sentencing, the same judge who presided over the trial heard evidence under N.C.G.S. §§ 15A-1340.19A and -1340.19B for *Miller* sentencing. The court heard statements from the surviving Borlase family members, including Taylor and Alexis, who described the excruciating pain of losing their parents and the trauma of having it be at the hand of their sibling. The court also heard testimony from Tristan, who expressed remorse for the pain he had caused and accepted that life without the possibility of parole may be the appropriate sentence. Defense counsel presented documentary evidence during the sentencing hearing of Tristan (1) being summoned "to the nest" for punitive midnight lectures, (2) needing to sleep in his car or a goat pen for warmth, (3) coping with intense conflict in the family, including occasional violence, and (4) being punished in a manner that included having no change of clothes on a week-long trip. The trial court was presented with expert testimony that concluded that Tristan's criminal conduct "was influenced by [his] conflicted relationship with his mother" and was "a culmination of years of conflict" and that towards the end Tristan felt he could "not do anything right"; he "quit trying to please and was just trying to make it through each day."

Importantly, the State did not contradict any of this evidence of family conflict or pressure. The State declined a further opportunity to present evidence after

Tristan's counsel finished and did not deny the veracity of the letters and e-mails from Tristan's teachers and church group leader.

After being presented with all this evidence, the trial court's sentencing order addressed the familial pressure factor. It concluded that Jeff and Tanya were "very loving, caring[,] and nurturing parents" who deeply loved their children and who sacrificed to provide for them. The trial court observed that "[w]hile the Defendant may have genuinely disagreed with the form of discipline (taking of privileges and interactive discussions), even he seemingly admits in his testimony that both his parents had his best interests . . . at heart." It contrasted Tristan's circumstances with the specific situations in *Miller*: that the individual had a troubled childhood, had lacked parental care or involvement, and had been exposed to drugs and violence. In light of the evidence presented and because Tristan's background differed substantially from the *Miller* facts, it ultimately concluded that "[t]here is no credible evidence before the Court to support any finding of mitigation as to this factor." The court's findings of fact made no mention of the significant family conflict or that the discipline used by at least one of Tristan's parents was objectively harsh and extreme, not simply subjectively disagreeable to the average teenager.

In so concluding, the trial court apparently misapprehended the applicable legal standard. Simply put, neglect or criminal involvement are not the only kinds of familial pressure relevant to juvenile sentencing. Family dysfunction is not limited to lack of parental care or resources. Evidence of extremely harsh discipline, ongoing

intrafamilial conflict and instability, and nonphysical abuse is also probative. Those things too are aspects of "the family and home environment that surround[ ]" a juvenile and leave him "susceptible to influence and to psychological damage." *Miller*, 567 U.S. at 476–77 (cleaned up). As *Miller* made clear, there is a constitutionally salient difference between "the child from a stable household and the child from a chaotic and abusive one." *Id.* at 477. A person's lack of agency over their home environment and the extreme pressure such an environment can create is a hallmark of an offender's juvenile status and is essential to the assessment of whether this is the "rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 479–80 (quoting *Roper*, 543 U.S. at 573). Being unable to excise oneself from familial dysfunction that manifests through nonphysical abuse is plainly within *Miller*'s purview and this statutory sentencing factor, contrary to the trial court's apparent understanding of the legal factor.

Perhaps because of its misunderstanding as to the legal standard, the trial court apparently failed to credit manifestly credible, uncontradicted evidence of familial pressure, a statutory factor. *See* N.C.G.S. § 15A-1340.19B(c)(7). The finding that Jeff and Tanya were loving parents does not negate or contradict the evidence of pressure and conflict in the Borlase's Deep Gap home. As the dissent at the Court of Appeals put it, "love and conflict are not mutually exclusive; rather, both can exist in a family simultaneously." *Borlase*, 292 N.C. App. at 76 (Arrowood, J., dissenting). The trial court thus erred by failing to credit a statutory mitigating factor supported by

manifestly credible and uncontradicted evidence. *See Jones*, 309 N.C. at 219–20.

**D. *Miller* and Juvenile Development**

The sentencing court's misapprehension of the scope of familial pressure represents a broader misunderstanding of *Miller*'s direction regarding the application of the "mitigating circumstances of youth" during sentencing. *Miller*, 567 U.S. at 476. In *Miller*, *Roper*, and *Graham*, the Supreme Court of the United States leveraged established knowledge from the fields of psychology, psychiatry, neurology, and behavioral science to ground its legal conclusions about the appropriateness of certain sentences for juveniles. *Miller*, 567 U.S. at 471–72; *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68. But a careful reading of these decisions shows the Court did not intend to create an immutable picture of how our understanding of child development should influence sentencing. The proper application of *Miller*'s mandate requires embracing the growing body of well-established studies that inform our understanding of youth criminal culpability and the potential for rehabilitation. Simply put, the Court illuminated a path for state courts to inform sentencing decisions with established science that reflects "the progress of a maturing society." *Graham*, 560 U.S. at 58 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

In this case, inconsistent with the teachings of *Miller*, the sentencing court viewed too narrowly the kinds of events or patterns in childhood that create familial pressure. The sentencing court defined this factor as "growing up exposed to a troubled childhood, lack of parental care and involvement, [or] exposure to drugs and

even violence." Using that narrow definition, the sentencing court concluded that "[n]one of the factors are present in this case." In effect, the sentencing court's definition cabined the examination of the familial pressure factor to the facts in *Miller*.

But that represents, we think, a crabbed view of what *Miller* commands us to do: use our growing understanding of childhood development to examine, based on science, what pressures have a traumatic effect on child development and whether a juvenile has the potential for rehabilitation. *See* 567 U.S. at 471–72; *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68. The sentencing court's limited view of familial or peer pressure is disconnected from the scientific community's widespread and modern understanding of familial and peer pressure. The range of psychological pressure that can have a negative impact on adolescent development is broader and includes psychological maltreatment as an element of familial pressure.

Psychological maltreatment can include a pattern of behavior denigrating, belittling, or humiliating the child or a level of domination, disparagement, and control exercised by the parent over the child. *See* Amy M. Smith Slep, et al., *Psychological Maltreatment*: *An Operationalized Definition and Path Towards Application,* Child Abuse & Neglect, 2 (2022) (defining psychological maltreatment as caregiver behaviors "which cause or have a strong potential to cause serious harm to a child's emotional, cognitive, social, interpersonal, or physical wellbeing or development"); Märta Wallinius, et al., *Offenders in Emerging Adulthood: Sch.*

*Maladjustment, Childhood Adversities, and Prediction of Aggressive Antisocial Behaviors*, 40 L. & Hum. Behav. 551, 552 (2016) (collecting studies that show the effect of childhood and adolescent maltreatment and the link to an increased risk of aggressive antisocial behaviors).

Psychological maltreatment can also include "thwarting of the child's basic emotional needs" including the need "for psychological safety and security in the environment, for acceptance and positive regard, and for age-appropriate autonomy." *See* Hilary B. Hodgdon, et al., *Maltreatment Type, Exposure Characteristics, and Mental Health Outcomes Among Clinic Referred Trauma-Exposed Youth*, Child Abuse & Neglect, 12 (2018) (finding "that [psychological maltreatment] is likely to occur within an early caretaking environment characterized by chaotic, unpredictable, and/or non-responsive caregiving behaviors"); Joshua A. Weller & Phillip A. Fisher, *Decision-Making Deficits Among Maltreated Children,* Child Maltreat., 3–4 (2013) (finding that "maltreated children showed increased risk-taking to avoid losses").

In this case, the sentencing court ignored the evidence demonstrating that Tristan's home life was chaotic and a place where he did not have a sense of psychological safety. While, as the trial court found, Tristan had two parents who loved him, his home life was chaotic and full of conflict. The family was separated due to familial conflict between the adoptive and biological children, including physical violence. Tristan resided primarily in Mooresville with his father, while his mother lived in a converted utility shed in Deep Gap; the family lived apart because some of

the children could not live together in the same home without physical conflict. Additionally, one of the adopted children was suddenly removed from the home and placed in therapeutic foster care.

The forensic psychologist testified to a high-conflict relationship between Tristan and his mother. When Tristan stayed in Deep Gap, his mother would keep him awake for long hours on multiple occasions each week to lecture him. These disciplinary practices led to Tristan experiencing feelings of not being able to "do anything right," self-loathing, inadequacy, and self-despair. In Tristan's home, love and conflict were not mutually exclusive. And it was a home environment from which Tristan could not extricate himself. *See Miller*, 567 U.S. at 477 (requiring sentencing courts to consider the family and home environment surrounding defendants).

According to the forensic psychologist, Tristan reported "a history of psychological abuse that, at times, escalated to physical punishment," and the pattern was cumulative over the years. At the time of the crimes, Tristan was in an "aroused and agitated state," severely impacting his ability to think and consider alternative courses of action. The forensic psychologist noted that "[t]here is ample scientific evidence that adolescent brain development impacts judgment, impulsivity, and emotional arousal." In the psychologist's view, Tristan "was suffering from substantial psychological conditions and environmental and situational stressors."

As the forensic psychologist's testimony confirmed, scientific research suggests some association between nonphysical harm and later violent acts. Psychological

maltreatment "leads to a range of adverse mental health and functional outcomes." Hodgdon, at 12. Childhood development studies have identified an association between multiple instances of psychological harm, including parental aggression, and the child's ideations of killing, attacking, or humiliating another person; the association peaks at age seventeen in males and disappears in young adulthood. Manuel Eisner, et al., *The Association of Polyvictimization with Violent Ideation in Late Adolescence and Early Adulthood: A Longitudinal Study*, 47 Aggressive Behavior, 472, 478 (2021); *see also* Margaret O'Dougherty Wright, et al., *Childhood Emotional Maltreatment and Later Psychological Distress Among College Students: The Mediating Role of Maladaptive Schemas*, Child Abuse & Neglect 59, 65 (2009) (reporting on the harmful effect of childhood emotional maltreatment among college students and emphasizing the importance of studying co-occurring forms of childhood abuse, neglect and other adverse family experiences).

In addition to missing the forest for the trees on the circumstances which create familial pressure, the sentencing court misunderstood the overarching command of *Miller*. When analyzing the mitigating circumstance of youth, we must look to a science-informed understanding of how childhood development impacts moral culpability in the still-developing brain. *See Miller*, 567 U.S. at 471–72; *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68.

## II.    Conclusion

A chaotic home life or psychological maltreatment is not, nor will it ever be, an excuse for the heinous murders Tristan committed. Tristan should be held accountable for his crimes. However, the command from and the spirit of *Miller* require us, and sentencing court, to consider the "mitigating qualities of youth" and the "transient" nature of the "immaturity, irresponsibility, impetuousness, and recklessness" that define this period. *Miller*, 567 U.S. at 476. That consideration is not based upon an immutable understanding of child development from when *Miller* was decided; rather from an evidence-based and growing understanding of the effect of psychological harm on a developing brain and the resulting impact on criminal culpability. Moreover, it was error not to credit manifestly credible, uncontradicted evidence of a factor that has mitigating value under *Miller*. We respectfully dissent and would remand this matter for a second sentencing hearing to consider the full scope of mitigating circumstances.